## STATUTORY ADDENDUM

**28 U.S.C. § 1651. Writs**

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

. . .

**28 U.S.C. § 2342. Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

> (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

. . .

**47 U.S.C. § 155. Commission**

. . .

(c) Delegation of functions; exceptions to initial orders; force, effect and enforcement of orders; administrative and judicial review; qualifications and compensation of delegates; assignment of cases; separation of review and investigative or prosecuting functions; secretary; seal

> (1) When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, delegate any of its functions (except functions granted to the Commission by this paragraph and by paragraphs (4), (5), and (6) of this subsection and except any action referred to in sections 204(a)(2), 208(b), and 405(b) of this title) to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter; except that in delegating review functions to employees in cases of adjudication (as defined in section 551 of Title 5), the delegation in any such case may be made only to an employee board consisting of two or more employees referred to in

paragraph (8) of this subsection. Any such rule or order may be adopted, amended, or rescinded only by a vote of a majority of the members of the Commission then holding office. Except for cases involving the authorization of service in the instructional television fixed service, or as otherwise provided in this chapter, nothing in this paragraph shall authorize the Commission to provide for the conduct, by any person or persons other than persons referred to in paragraph (2) or (3) of section 556(b) of Title 5, of any hearing to which such section applies.

. . .

(3) Any order, decision, report, or action made or taken pursuant to any such delegation, unless reviewed as provided in paragraph (4) of this subsection, shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders, decisions, reports, or other actions of the Commission.

(4) Any person aggrieved by any such order, decision, report or action may file an application for review by the Commission within such time and in such manner as the Commission shall prescribe, and every such application shall be passed upon by the Commission. The Commission, on its own initiative, may review in whole or in part, at such time and in such manner as it shall determine, any order, decision, report, or action made or taken pursuant to any delegation under paragraph (1) of this subsection.

. . .

(7) The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title, shall be computed from the date upon which public notice is given of orders disposing of all applications for review filed in any case.

. . .

No. 26-_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

IN RE SHERROD BROWN, JON OSSOFF, ROY COOPER, AND KRISTEN MCDONALD RIVET,

*Petitioners.*

---

# ADDENDUM TO PETITION FOR WRIT OF MANDAMUS TO THE FEDERAL COMMUNICATIONS COMMISSION

---

David R. Fox
Richard A. Medina
Nicole E. Wittstein
Julianna D. Astarita
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law
jastarita@elias.alw

*Counsel for Petitioners Sherrod Brown, Jon Ossoff, Roy Cooper, and Kristen McDonald Rivet*

## TABLE OF CONTENTS

Petitioners' Application for Review (Apr. 29, 2026) ....................................... Add. 1

FCC 28(j) Letter (Aug. 17, 2026) ................................................................. Add. 33

Exhibits to FCC's 28(j) Letter: Order on Reconsideration (Aug. 13, 2026) .. Add. 35

Commissioner Gomez's Press Release (Aug. 25, 2026) ................................ Add. 39

Commissioner Gomez' Dissent to Media Bureau Order (Aug. 25, 2026) ..... Add. 41

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>*Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees* | Docket No. ________<br><br>DA 26-300 |

# APPLICATION FOR REVIEW


David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

*Counsel for Applicants*


April 29, 2026

## TABLE OF CONTENTS

Summary ........ iii

Application for Review ........ 1

Question Presented ........ 1

Background ........ 2

I. Statutory and regulatory framework ........ 2

A. The "lowest unit charge" entitlement ........ 2

B. The Media Bureau's LUC Guidance ........ 5

C. The Applicants ........ 6

Argument ........ 9

I. The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees ........ 9

A. Party committees' coordinated expenditures are not use by a candidate. ........ 10

B. Advertisements by JFCs with non-candidate members are not "use" by a candidate. ........ 13

C. Applicants are aggrieved by the Media Bureau's LUC Guidance. ........ 17

Conclusion ........ 19

## SUMMARY

In 1971, to address candidates' ballooning campaign costs, Congress required broadcast stations to provide special low rates—known as "lowest unit charge"—to candidates in the run-up to elections. The plain text of the resulting statute, codified at Section 315(b) of the Communications Act, reflects this limited purpose—it entitles only "candidates" to the special rates. 47 U.S.C. § 315(b)(1). But the Media Bureau recently issued guidance purporting to require broadcast stations to offer lowest unit charge to advertising purchased by two categories of non-candidate political committees: (1) party committees engaged in coordinated expenditures and (2) "Joint Fundraising Committees" (JFCs) with candidate and non-candidate committee members. That guidance directly conflicts with the plain text of the Communications Act and the Commission should set it aside, making clear that only candidates and candidate committees are entitled to lowest unit charge.

Advertisements by party committees are not entitled to lowest unit charge because they are not "use" of a broadcasting station "by . . . a legally qualified candidate," *id.*, even if they are "coordinated" with a candidate. The Federal Election Campaign Act (FECA) distinguishes between (1) party committee *contributions* to candidate committees for the candidate's own use, *see* 52 U.S.C. § 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *see id.* § 30116(d). The latter are "use" by a party committee, not by a candidate, because they are required to be the party committee's expenditures—if they were the candidate's use, they would be unlawful contributions to the candidate's committee.

Advertisements by JFCs with candidate and non-candidate members are also not entitled to lowest unit charge because, by law, much of the cost of those advertisements is borne by non-candidate members who are not entitled to lowest unit charge. *See* 11 C.F.R. § 102.17(c)(7). The

Media Bureau justified its guidance by noting that JFCs can be formally designated as "authorized committees" of candidates under FECA. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 U.S.C. § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends *the candidate's* share of fundraising expenses and receives *the candidate's* share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). It does not justify treating JFC expenditures as candidate expenditures entitled to lowest unit charge, even though some, and often nearly all, of those expenditures are paid for by non-candidate committees with no right to lowest unit charge.

Expedited action by the Commission is essential. The Bureau's unlawful guidance will imminently harm candidates in competitive House and Senate races in the 2026 cycle, including Applicants Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald Rivet, and their respective campaign committees. By forcing broadcasters to charge lower rates to non-candidate committees that—unlike Applicants—are not entitled to them, the Bureau's guidance ensures that Applicants will "face intensified competition" for limited airtime in violation of the Communications Act. *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (emphasis omitted). They will also be subject to—and forced to respond to—a greater volume of negative advertisements purchased at lower rates. And because the Bureau's guidance allows non-candidates to buy more advertisements at lower rates, Applicants will be hampered in their ability to control their own independent campaign messages and policy positions, which risk being drowned out by political party messaging—from the Republican and Democratic Parties alike. As candidates for public office, Applicants have "an interest in a fair process" untainted by unlawful ad spending. *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 (2026). The Commission should

set aside the Bureau's erroneous guidance and vindicate Congress's "effort to reduce candidates' escalating campaign costs" without extending those same benefits to other groups. *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54 (1991).

## APPLICATION FOR REVIEW

Applicants Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald Rivet, along with their principal campaign committees,[1] respectfully request that the Commission set aside the FCC Media Bureau's March 30, 2026, Public Notice providing Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees, DA 26-300 ("LUC Guidance"). The LUC Guidance merits the Commission's review because it is in direct conflict with the Communications Act of 1934. *See* 47 CFR § 1.115(b)(2)(i). The LUC Guidance is attached to this Application as Exhibit A.

Applicants bring this challenge as an Application for Review pursuant to the D.C. Circuit's decision in *National Ass'n of Broadcasters v. FCC*, No. 14-1072, 2014 WL 4449657 (D.C. Cir. Sep. 9, 2024) (unpublished), which held that a challenge to a similar guidance document may—and must—be initiated via this procedure.

## QUESTION PRESENTED

Whether the Media Bureau's March 30, 2026, Public Notice, DA 26-300, requiring broadcasters to provide the lowest unit charge for (1) political party committees' advertisements that qualify as coordinated expenditures under FECA, and (2) joint fundraising committees' advertisements, must be set aside as contrary to Section 315(b)(1) of the Communications Act of 1934?

[1] Friends of Sherrod Brown, Jon Ossoff for Senate, Cooper for North Carolina, and Kristen for Michigan.

## BACKGROUND

### I. Statutory and regulatory framework

#### A. The "lowest unit charge" entitlement

Section 315(b)(1) of the Communications Act of 1934 entitles "legally qualified candidate[s] for any public office" who "use . . . any broadcasting station" shortly before their elections to do so at "the lowest unit charge of the station for the same class and amount of time for the same period." 47 U.S.C. § 315(b)(1). This valuable entitlement takes effect 45 days before the candidate's primary election or runoff and 60 days before the candidate's general election. *Id.* § 315(b)(1)(A). It was enacted in its present form as part of the Federal Election Campaign Act of 1971 (FECA), which comprehensively regulates the finances of federal campaigns. *See Hernstadt v. FCC*, 677 F.2d 893, 897 (D.C. Cir. 1980).

FECA requires all federal candidates to designate a "principal campaign committee" to accept contributions and make expenditures on their behalf. 52 U.S.C. § 30102(e)(1). Everyone agrees that stations must offer lowest unit charge for advertisements purchased by those principal campaign committees on behalf of the "legally qualified candidate" they support. This Application concerns whether stations must *also* offer lowest unit charge to advertisements purchased by two other categories of committees that are further removed from the candidates themselves: party committees engaged in coordinated expenditures under 52 U.S.C. § 30116(d), and joint fundraising committees established by candidates and non-candidates "solely for the purpose of joint fundraising by such candidates," *id.* § 30102(e)(3)(A)(ii). While the dispute is ultimately over the meaning of the Communications Act, understanding it requires an explanation of federal campaign finance law's treatment of those two categories of committees.

**Party Committee Coordinated Expenditures.** FECA sharply limits the size of "contributions" that may be made to federal political committees, including candidate committees.

*See* 52 U.S.C. § 30116(a). To prevent donors from evading those limits by directly paying vendors on a candidate's behalf, FECA also treats as contributions, subject to those same limits, expenditures that are "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." *Id.* § 30116(a)(7)(B)(i); *see Shays v. FEC*, 414 F.3d 76, 97 (D.C. Cir. 2005). But FECA contains an important exception to that treatment, which Congress enacted with its 1974 FECA amendments: State and national political party committees may make substantial coordinated expenditures in connection with federal candidates' campaigns without those expenditures being treated as contributions. *See* 52 U.S.C. § 30116(d). In the 2026 cycle, eligible party committees may coordinate with candidates with respect to up to $130,600 of expenditures for most House contests and between $130,600 and $4 million in Senate contests.[2] The Supreme Court is currently weighing whether the First Amendment prohibits restricting at all the amount that parties may spend on coordinated expenditures. *See generally NRSC v. FEC*, No. 24-621 (U.S.). But whether party coordinated expenditures remain limited or become unlimited, they must still be *the party's* expenditures rather than the candidate's—that is, the party must be the one paying the bills—because the parties' direct monetary contributions to candidate committees are subject to much lower limits that are not being challenged in the pending Supreme Court case. *See* 52 U.S.C. § 30116(a)(1)(A), (h); Tr. of Oral Argument at 82:15-83:8, *NRSC*, No. 24-621.[3]

**Joint Fundraising Committees.** In addition to establishing a principal campaign committee, FECA allows federal candidates to "designate a political committee established solely

[2] *See Coordinated Party Expenditure Limits*, FEC, https://www.fec.gov/help-candidates-and-committees/making-disbursements-political-party/coordinated-party-expenditures/coordinated-party-expenditure-limits/ (last visited Apr. 28, 2026).

[3] Oral Arg. Transcript, *NRSC v. FEC*, No. 24-261 (U.S. Dec. 9, 2025), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-621_q86b.pdf.

for the purpose of joint fundraising by such candidates as an [additional] authorized committee." 52 U.S.C. § 30102(e)(3)(A)(ii); 11 C.F.R. § 102.17(a)(1), (2). Such committees are commonly known as "joint fundraising committees" or "JFCs." To form a JFC, the participating committees must establish a separate committee (or designate one of the participating committees) to serve as the joint fundraising representative and enter into an agreement that "state[s] a formula for the allocation of fundraising proceeds." 11 C.F.R. § 102.17(c)(1). A JFC's only permissible purpose is to "collect contributions, pay fundraising costs from gross proceeds and from funds advanced by participants, and disburse net proceeds to each participant." *Id.* § 102.17(b)(1); *see* 52 U.S.C. § 30102(e)(3)(A)(ii). In doing so, the FEC's joint fundraising regulation requires JFC participants to split expenses for each fundraising effort in proportion to their split of proceeds from that effort. 11 C.F.R. § 102.17(c)(7). In recent years, candidates have formed JFCs with party committees, which have higher contribution limits than candidates; with national party committees' even-higher-limit specialty account; and with other non-candidate committees, which also have higher contribution limits than candidates. An overwhelming majority of proceeds of these JFCs flow to the non-candidate committees, due to their higher contribution limits, which therefore bear the overwhelming majority of expenses as well.[4]

Beginning in the 2024 election cycle, select JFCs began running advertisements that were nearly indistinguishable from ordinary campaign ads. These advertisements advocated expressly for a specific Republican Senatorial candidate and against their Democratic opponent. Some

[4] *See, e.g.*, *Nevada Victory Committee*, FEC, https://www.fec.gov/data/committee/C00890962/ (last visited Apr. 28, 2026); *Wisconsin Victory Committee*, FEC, https://www.fec.gov/data/committee/C00889493/ (last visited Apr. 28, 2026).

advertisements were narrated by a Republican candidate, touting the candidates' background.[5] Others attacked Democratic opponents as corrupt or radical.[6] The only feature that distinguishes these ads from typical candidate or party-coordinated ads is a brief fundraising pitch—a call to "join" the candidate's "team"—in the final few seconds, along with an on-screen QR-code that prompts donations to the JFC.

### B. The Media Bureau's LUC Guidance

Until recently, the FCC had not provided direct guidance on whether party coordinated expenditures and JFC expenditures are entitled to lowest unit charge for their use of broadcasting stations shortly before elections. And in connection with the litigation over the constitutionality of the party coordinated expenditure limits in *NRSC v. FEC*, the Solicitor General argued in his reply brief that the Communications Act "require[s] broadcasters to charge low rates for candidate spending, *but not for party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC v. FEC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added).

After this announcement, the National Association of Broadcasters released a new guidance memo to its broadcaster members. *See* Ex. B ("NAB Memo"). NAB stated its "belie[f]" that "a candidate's designated principal campaign committee is entitled to lowest unit charge, while 'joint fundraising committees' and other 'hybrid' committees are not."

On March 30, 2026, just days after the NAB Memo was issued, the Media Bureau issued the LUC Guidance. The LUC Guidance states the Bureau's position that "the LUC requirements

---

[5] *More Work to Do*, MI Victory Committee/Rogers, https://perma.cc/GY65-XBX6 (last visited Apr. 29, 2026); *Call to Duty*, Sheehy Victory Committee, https://perma.cc/9S62-6XMR (last visited (Apr. 29, 2026).

[6] *See, e.g.*, *Conflict of Interest*, WI Victory JFC/Hovde, https://perma.cc/8KUC-ZX7Z (last visited Apr. 29, 2026); *Radical Too*, Fischer Victory Fund, https://perma.cc/AV7G-FBPX (last visited Apr. 29, 2026).

are applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office." Ex. A ("LUC Guidance") at 1. It states that "the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees" because the Act "repeatedly refers to candidates and their authorized committees as sharing the rights it confers." *Id.* It asserts that "[t]he FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under FECA." *Id.* at 2. And it further purports to "restate previous Media Bureau guidance" (which it neither cites nor otherwise identifies) that "candidate-party coordinated advertisements are subject to the LUC provisions, provided that the ad otherwise complies with other applicable requirements." *Id.*

### C. The Applicants

Applicants are legally qualified Democratic candidates for the U.S. House of Representatives and U.S. Senate in the upcoming 2026 election, along with their principal campaign committees. Each is running in a highly competitive race that has been targeted by the Republican Party for likely coordinated party expenditures in support of Applicants' opponents.

Applicant Sherrod Brown served three terms as United States Senator from the state of Ohio, from 2007 until 2025. In 2024, Senator Brown lost his seat by less than 4% in a hotly contested race to now Senator Bernie Moreno. He is now challenging sitting Senator Jon Husted in the 2026 election, whom Ohio Governor Mark DeWine appointed to fill the seat vacated by Vice President J.D. Vance. The NRSC has characterized the Ohio Senate seat as one of only three

"true defensive targets."[7] Senator Brown therefore expects the race will draw significant spending by NRSC, including in party-candidate coordinated advertisements. In 2024, the NRSC spent more than $1.9 million on media in coordination with Senator Bernie Moreno's campaign to unseat Senator Brown,[8] and nearly $90k more in independent expenditures.[9]

Applicant Jon Ossoff is a United States Senator for the State of Georgia. Senator Ossoff won his seat in 2020 in an exceedingly close and nationally watched race. On election night, no candidate received more than 50% of the vote, forcing the race to a runoff between Senator Ossoff and then-incumbent Senator David Perdue. In the runoff election on January 5, 2021, Senator Ossoff prevailed by only 1.2%. The Republican Party has publicly touted Senator Ossoff's seat "as their top pickup opportunity in the Senate,"[10] and reporters have suggested that the race "may become the most expensive Senate race ever."[11] Indeed, the 2020 race for Senator Ossoff's seat currently holds the record for most expensive Senate race in history,[12] with the NRSC spending $1.3 million in coordinated expenditures with then-Senator Perdue's campaign,[13] and another $14

---

[7] Max Greenwood, *NRSC Chair Tim Scott Predicts Record-Breaking Spending in 2026 Senate Race*, Campaigns & Elections (Feb. 10, 2025), https://campaignsandelections.com/industry-news/nrsc-chair-predicts-record-spending-in-2026/.

[8] *Party-coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4OH00192&cycle=2024 (last visited Apr. 29, 2026).

[9] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2024&is_notice=true&candidate_id=S6OH00163 (last visited Apr. 29, 2026).

[10] Liz Goodwin, *Republicans Privately Fear This Swing State Democrat*, The Wash. Post (Mar. 23, 2026), https://www.washingtonpost.com/politics/2026/03/23/ossoff-georgia-senate-midterms-democrats-republicans/?utm_campaign=wp_main&utm_source=facebook&utm_medium=social.

[11] Max Cohen & John Bresnahan, *Ossoff Gears Up for Fight of His Political Life in 2026*, Punchbowl News (Feb. 6, 2025), https://punchbowl.news/article/campaigns/jon-ossoff-gets-ready-for-2026-senate-race/.

[12] Greenwood, *supra* note 7.

[13] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4GA11285&cycle=2020 (last visited Apr. 28 , 2026).

million in independent expenditures opposing Ossoff's candidacy.[14] To that end, Senator Ossoff expects the 2026 race will draw significant spending by the NRSC, as well.

Applicant Roy Cooper is the former Governor of North Carolina. He announced his candidacy for United States Senate on July 28, 2025, and he won the Democratic Party primary election for U.S. Senate in North Carolina on March 4, 2026. Like Ohio, the NRSC has characterized the North Carolina Senate seat as a "true defensive targets."[15] Governor Cooper therefore expects the race to draw significant spending by the NRSC. In 2022, when North Carolinians last elected a U.S. Senator, the NRSC spent $1.7 million in coordinated expenditures with Senator Ted Budd for media supporting his campaign.[16] And it spent more than $6 million more in independent expenditures opposing the Democratic candidate.[17]

Applicant Kristen McDonald Rivet represents Michigan's 8th Congressional District in the House of Representatives. Representative McDonald Rivet won her seat in 2024 in an election in which Donald Trump carried her district by two points. Representative McDonald Rivet will be on the ballot in November 2026 to keep her seat in MI-8. NRCC has announced its plan to target MI-8 to expand its House majority this election cycle,[18] and Representative McDonald Rivet expects NRCC will dedicate significant resources toward advertisements opposing her reelection.

---

[14] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2020&is_notice=true&candidate_id=S8GA00180 (last visited Apr. 28, 2026).

[15] Greenwood, *supra* note 7.

[16] *Party Coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S2NC00505&cycle=2022 (last visited Apr. 28, 2026).

[17] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=NRSC&cycle=2022&is_notice=true&candidate_id=S2NC00497 (last visited Apr. 28, 2026).

[18] *NRCC Targets 26 Offensive Seats to Expand House Majority*, NRCC (Mar. 17, 2025), https://www.nrcc.org/2025/03/17/nrcc-targets-26-offensive-seats-to-expand-house-majority/.

In the 2024 election cycle, NRCC spent nearly $630,000 in independent expenditures on media opposing Representative McDonald Rivet's candidacy.[19] And in 2022, NRCC coordinated more than $100,000 in expenditures with the Republican candidate for MI-8.[20]

## ARGUMENT

### I. The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees.

The LUC Guidance must be set aside because it unlawfully requires broadcasters to offer lowest unit charge for advertisements that are not entitled to it under the Communications Act. Section 315(b)(1) provides for lowest unit charge *only* "for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign." 47 U.S.C. § 315(b)(1). Lowest unit charge is therefore available only for uses of broadcasts *by candidates*, and not for other political advertisements. The Commission has explained that "*only candidates* are entitled to lowest unit charge benefits," and it has "*never* held that independent entities" that support or oppose candidates are "entitled to the lowest unit charge." *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54, 686 (1991) (emphasis added). Commission regulations implementing the statutory lowest unit charge provision similarly provide that lowest unit charge is available for use by "any *person* who is a legally qualified *candidate* for any public office." 47 C.F.R. § 73.1942(a) (emphasis added).

As the Commission has explained, the lowest unit charge provision reflects a "Congressional effort to reduce *candidates'* escalating campaign costs." *In re Codification of*

---

[19] *Independent Expenditures*, FEC, https://www.fec.gov/data/independent-expenditures/?data_type=processed&q_spender=C00075820&is_notice=false&most_recent=true&candidate_id=H4MI08218&min_date=01%2F01%2F2023&max_date=12%2F31%2F2024 (last visited Apr. 28, 2026).

[20] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00075820&candidate_id=H0MI08141 (last visited Apr. 28, 2026).

*Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54 (emphasis added). To that end, the provision "regulat[es] rates charged political candidates," and it was "viewed [by Congress] as providing an additional break for candidates." *Hernstadt*, 677 F.2d at 897. It "was intended to ensure that, during the pre-election period, *candidates* would receive . . . volume and frequency discounts regardless of the number of announcements purchased." *Id.* at 890 (emphasis added). But its scope was intentionally limited, to avoid "imposing unreasonable and possibly economically devasting burdens on small stations." *Id.* at 898.

The LUC Guidance must be set aside as unlawful because it purports to require stations to offer lowest unit charge to advertisements from party committees engaged in coordinated spending and from JFCs, when neither constitutes the use of a broadcasting station by a legally qualified candidate, as Section 315(b)(1)'s plain text demands.

**A. Party committees' coordinated expenditures are not use by a candidate.**

Party committees' coordinated expenditures are not entitled to lowest unit charge because they are expenditures by the party committees, not by candidates, so they are not "use" of a broadcasting station "by . . . a legally qualified candidate" as Section 315(b)(1) requires. This follows directly from FECA's distinction between (1) party committee *contributions* to candidate committees, which transfer funds to candidates that the candidates can then spend to purchase broadcast time for their own "use," *see* 52 U.S.C. § 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *not* the candidate, although the party and candidate are free to discuss and plan them in advance, *see id.* § 30116(d). For party committee advertisements to be *the candidate's* use, they would need to be purchased by the candidate's campaign, not by the party—and if so, they would involve *contributions* by party committees to the campaign, rather than coordinated expenditures. By treating party committee advertisements as candidate spending under the Communications Act when it is party spending

under FECA, the LUC Guidance improperly puts the two statutes "at war with one another," instead of reading them "as a harmonious whole." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

Section 315(b)(1) does not require lowest unit charge for the "use" of a broadcasting station by a political party or any other non-candidate political group—only by a "legally qualified candidate." It was specifically crafted to "reduce *candidates'* escalating campaign costs." *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54 (emphasis added). That is why the Commission has "never held that independent entities were entitled to the lowest unit charge," even for ads supporting or opposing candidates, but has instead emphasized that "the lowest unit charge *inures to the benefit of candidates only*." *Id.* (emphasis added). If Congress had wanted to extend lowest unit charge to party expenditures also, it easily could have said so when it first authorized coordinated expenditures a short two years after passing the lowest unit charge requirement in the first place. But it opted instead to limit the entitlement to avoid "imposing unreasonable and possibly economically devasting burdens on small stations." *Hernstadt*, 677 F.2d at 898; *see also Hayes v. Sebelius*, 762 F. Supp. 2d 90, 115 (D.D.C. 2011) ("[W]hen Congress amends one provision of a statute but not another, it can be interpreted to have signaled its intention not to apply the amendment to the unaffected provision.").

Consistent with the provision's text and purpose, the Commission has historically interpreted Section 315(b)(1) to mean that "only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b)." *In re Codification of the Commission's Pol. Programming Pol'ys*, Memorandum Opinion and Order, 7 FCC Rcd. 4611, 4614, ¶ 23 (1992). As explained below with respect to JFCs, this interpretation is overbroad to the extent it permits JFCs to benefit from lowest unit charge even when some of their members are

not candidate committees. But party committees' coordinated spending fails even this overbroad test. With one exception in presidential contests that is inapplicable to Applicants' circumstances,[21] party committees are not and cannot be "authorized campaign committees" under FECA because, by their very nature, they "support[] or ha[ve] supported more than one candidate" for office, and they exist to do more than "solely . . . joint fundraising." 52 U.S.C. § 30102(e)(3)(A). Thus, party coordinated expenditures are made neither by a candidate nor by "their authorized campaign committee[]," so they fail the Commission's own longstanding test of lowest unit charge eligibility.

The LUC Guidance has no answer to these arguments. The Guidance acknowledges that advertising "purchased by political parties as an independent expenditure is not entitled to LUC." Ex. A at 2. It points out that such expenditures are not coordinated with candidates. But it does not explain how coordination could convert a party's own expenditure into the use of a station by a candidate. The more natural reading of the statute, by far, is that offered by the Solicitor General to the Supreme Court late last year: that lowest unit charge is available *only* for candidates and is "not [available] for *party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added). And while the Guidance purports to merely "restate previous Media Bureau guidance" on the subject, it does not cite any and Applicants are aware of none. Ex. A at 2. The only source the Guidance cites on this subject is *FEC v. Colorado Republican Federal Campaign Committee*, 41 F. Supp. 2d 1197 (D. Colo. 1999). But that case—which was ultimately reversed, *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001)—holds no such thing. The quoted language—that "independent expenditures do not qualify for the lowest rates on the purchase of

[21] FECA allows a presidential candidate nominated by a political party to designate the national committee of the party as a principal campaign committee, but only if the national committee retains separate accounts with respect to that function. 52 U.S.C. § 30102(e)(3)(A)(i).

broadcasting time, as coordinated expenditures would"—is not a holding of the court but merely a description of one party's statement of undisputed facts. 41 F. Supp. 2d at 1210.

The LUC Guidance's statement that "candidate-party coordinated advertisements are subject to the LUC provisions" is therefore unlawful, because it purports to extend the entitlement to lowest unit charge to the use of broadcasting stations by political parties, whereas—as the Commission has long recognized—Congress limited that entitlement to candidates only.

### B. Advertisements by JFCs with non-candidate members are not "use" by a candidate.

Advertisements by JFCs with non-candidate members are also not "use" of a broadcasting station "by . . . a legally qualified candidate" that is entitled to lowest unit charge because by law, much of the cost and much of the fundraising benefit of those advertisements must be borne by the non-candidate members of the JFC who have no right to lowest unit charge. In practice, those non-candidate members often completely dominate JFC fundraising. In the 2024 cycle, for example, the NRSC and Rogers for Senate formed a JFC, Michigan Victory Committee, that spent more than 98% of its receipts (more than $9 million) on advertising, while disbursing very little to its participants: just over 1% of its receipts (just under $100,000) to the NRSC, and just 0.02% (barely $2,000) to Rogers for Senate, the only candidate-committee member.[22] Under FEC rules, that means that the NRSC—the recipient of 98% of the proceeds after advertising expenses—must have paid for 98% of the more than $9 million in advertising expenses, while Rogers for Senate paid just 2%. *See* 11 C.F.R. § 102.17(c)(7). And, as explained above, the NRSC as a party committee is not entitled to lowest unit charge because its advertising expenses are not the use by *a candidate* of a broadcasting station. Yet the LUC Guidance requires stations to treat all of this

---

[22] *See Michigan Victory Committee – Disbursements*, FEC, https://www.fec.gov/data/committee/C00888883/?tab=spending#total-disbursements (last visited Apr. 28, 2026).

JFC's advertising expenses as if they are "use" by a candidate whose committee pays for almost none of them.

The Michigan Victory Committee did not stand alone. NRSC used the same strategy in Nevada and Wisconsin.[23] And even JFCs that do raise substantial money, rather than serving merely as advertising vehicles, often raise far more for party committees and PACs that are not entitled to lowest unit charge than they raise for candidate committees that are so entitled—meaning that their advertising expenses are overwhelmingly paid by committees not entitled to lowest unit charge. Grow the Majority, for example—Speaker Mike Johnson's principal joint fundraising committee—made more than half of its 2025 disbursements to party committees and non-candidate PACs, and less than half to candidate committees that could be entitled to lowest unit charge.[24]

The LUC Guidance's only justification for extending lowest unit charge to advertising purchased by JFCs like these—advertising which by law is paid for primarily by committees that are not entitled to lowest unit charge—is that the JFCs are formally designated as "authorized campaign committees" of the participating candidates. *See* Ex. A at 2. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends the candidate's share of fundraising expenses and receives the candidate's share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). But that *at most* makes the *candidate's share* of the JFC's expenditures into candidate expenditures—it does not in any way transform the portions of the

---

[23] *See supra* note 4.

[24] *Grow the Majority – Spending*, FEC, https://www.fec.gov/data/committee/C00858373/?tab=spending (last visited Apr. 28, 2026).

JFC's expenditures paid for by non-candidate committees into candidate use that could qualify for lowest unit charge. It therefore does not justify treating expenditures by JFCs with non-candidate members as entitled to lowest unit charge, as the LUC Guidance does, because those expenditures are partially—and often overwhelmingly—paid for by non-candidates.

The mere fact that JFCs are designated as "authorized committees" by participating candidates does not justify the LUC Guidance's anomalous treatment of JFC expenditures funded in large part by non-candidates as if they were candidate use. The phrase "authorized committee" does not appear in the text of Section 315(b)(1), which grants *only candidates* the right to lowest unit charge. Nor does it appear anywhere in the Commission's regulations. *See* 47 C.F.R. § 73.1942. The only place the phrase "authorized committee" appears in the relevant statute is in a different subsection of Section 315, 47 U.S.C. § 315(b)(2). And that Subsection (b)(2), titled "Content of broadcasts," does not grant substantive rights to candidates, authorized committees, or anybody else. Instead, it places conditions on a *candidate's* right to lowest unit charge, which is separately conferred in Subsection (b)(1). Subsection (b)(2) provides that, to be eligible for lowest unit charge, a candidate must make a "written certification" that "the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under [the Communications Act]," unless the ad also includes a disclaimer indicating that the candidate approved the broadcast and that the candidate's authorized committee paid for the broadcast. 47 U.S.C. § 315(b)(2)(A), (C). By its plain terms, this condition applies to "*any*" television or radio broadcast made by the candidate *or* the candidate's authorized committee—not just those entitled to lowest unit charge.

Subsection (b)(2) therefore does not mean that every "authorized committee" broadcast is entitled to lowest unit charge. It simply means that, for a candidate to receive lowest unit charge

for his *own* ads, he must certify that neither he nor any of his "authorized committees" will run *any* advertisement that mentions an opponent without including the required disclaimer. In other words, Section 315(b)(1) offers a limited benefit to candidates—lowest unit charge for candidate ads—in exchange for a broader commitment to abide by the conditions in Subsection (b)(2) in both candidate ads *and* authorized committee ads—including JFC ads. Nothing in the statute or its purpose limits the universe of broadcasts covered by Subsection (b)(2) to those covered by Subsection (b)(1). Thus, there is no reason to read the limitations in Subsection (b)(2) as enlarging the scope of entities entitled to lowest unit charge under Subsection (b)(1).

Confirming this, Subsection (b)(2)(B) provides that if the candidate "or any authorized committee of such candidate" breaches the conditions in Subsection (b)(2)(A), then "such *candidate* shall not be entitled to receive [lowest unit charge] on such broadcast or *any other* broadcast" within the covered period. *Id.* § 315(b)(2)(B) (emphasis added). Notably, this subsection does not say that a violation of Subsection (b)(2)(A) disentitles "authorized committees" from receiving lowest unit charge. If Congress meant for *both* "candidates" and "authorized committees" to get lowest unit charge, then the omission of "authorized committees" from this second clause of Subsection (b)(2)(B) would make little sense—it would produce a loophole that would swallow subsection (b)(2) whole. *See County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183 (2020) (rejecting a reading of a statute that "is inconsistent with the statutory text and simultaneously creates a massive loophole").

That both the "carrot" in Subsection (b)(1)—entitlement to lowest unit charge—and the "stick" in Subsection (b)(2)(B)—disentitlement from lowest unit charge—mention only "candidates" and not "authorized committees" is telling. This is particularly so because Congress *did* mention "authorized committees" in the parts of Subsection (b)(2) that describe the universe

of ads subject to the disclaimer requirement. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration omitted).

Thus, because broadcasting purchased by JFCs with non-candidate members is partially—and often overwhelmingly—paid for by non-candidate committees that are not entitled to lowest unit charge, the LUC Guidance is unlawful in requiring stations to extend lowest unit charge to such broadcasts.

**C. Applicants are aggrieved by the Media Bureau's LUC Guidance.**

The Commission's regulations authorize "[a]ny person aggrieved by any action taken pursuant to delegated authority [to] file an application requesting review of that action by the Commission." 47 C.F.R. § 1.115(a). Applicants have been "aggrieved" by the LUC Guidance within the meaning of Section 1.115(a).

Federal law widely recognizes "competitive injuries" for political candidates. A candidate for office suffers a legally cognizable injury "when regulations illegally structure [the] competitive environment" governing their election. *Shays*, 414 F.3d at 87. That is, candidates "suffer injury to a statutorily protected interest if" governing regulations require them to "compete for office in contests tainted" by illegal practices. *Id.* at 85. Such an injury arises, for example, when a candidate "face[s] *intensified* competition" under an unlawful regulatory scheme, requiring them to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." *Id.* at 86.

That is just the case here. Applicants are four legally qualified candidates for the U.S. House of Representatives and U.S. Senate and their principal campaign committees. Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald

Rivet will all appear on the 2026 general election ballot. Under Section 351(b), Applicants are indisputably entitled to lowest unit charge for their political advertisements.

Applicants' races are highly competitive. NRCC has announced it is targeting Representative McDonald Rivet's seat to attempt to expand the Republicans' majority in the House of Representatives this fall.[25] And the NRSC views Senator Ossoff's seat, as well as the North Carolina and Ohio seats for which Governor Cooper and Senator Brown are running, as absolutely critical to maintain Republican control of the Senate.[26] Applicants therefore expect that the Republican party committees will dedicate substantial resources toward political advertising opposing Applicants' campaigns and supporting their opponents, including through coordinated expenditures and JFC advertising. That is exactly what NRCC and NRSC have done in recent years: these committees have spent millions of dollars in coordinated expenditures with Republican candidates in recent election cycles,[27] and it is expected this cycle will shatter existing spending records.[28]And given these projections, Applicants also expect that more JFCs will continue the practice a select few test-drove in 2024 of running advertisements that function as candidate ads for their opponents.

For the reasons Applicants explain above, a straightforward, textual reading of Section 351(b) does not require broadcasters to offer party committees or JFCs lowest unit charge in these circumstances. Broadcasters *should* be permitted to charge party committees—which are vastly better resourced than Applicants and their designated campaign committees—normal rates for airtime. But the Media Bureau's LUC Guidance instead unlawfully requires broadcasters to charge

---

[25] *Supra* note 18.
[26] *Supra* notes 7, 10–11.
[27] *Supra* notes 8–9; 13–14; 16–17; 19–20.
[28] *See* Cohen & Bresnahan, *supra* note 11.

party committees lowest unit charge for candidate-coordinated advertisements and JFC advertisements, thereby vastly reducing the cost to run ads against Applicants and supporting their opponents. This illegal discount for party coordinated and JFC ads places Applicants at a competitive disadvantage, forcing them to respond to a higher volume of the counter advertisements than otherwise could have been purchased at the same price point, and diluting their independent campaign messaging—which is supposed to be privileged by the Communications Act—with party messaging at lower rates than it is entitled to under law.

Moreover, because the issue directly affects Applicants' ongoing campaigns for the 2026 election, urgent action by the Commission is needed to correct the Media Bureau's erroneous guidance. Applicants reasonably expect that JFC and party-coordinated broadcast spending against them will begin in just the next few months. The Commission should therefore expedite this matter and promptly set aside the LUC Guidance.[29]

**CONCLUSION**

The Commission should set aside the LUC Guidance and explain that only candidates and their principal campaign committees are entitled to lowest unit charge.

[29] It was "not possible" for applicants "to participate in the earlier stages of the proceeding," 47 C.F.R. § 1.115(a), because there was no earlier proceeding—the Bureau did not solicit public input before it issued the LUC Guidance.

Dated: April 29, 2026

Respectfully submitted,

______________________

David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

*Counsel to Applicants*

# EXHIBIT A

PUBLIC NOTICE

Federal Communications Commission
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov
TTY: 888-835-5322

**DA 26-300**
**Released: March 30, 2026**

**FCC MEDIA BUREAU PROVIDES GUIDANCE ON ENTITLEMENT TO LOWEST UNIT CHARGE FOR LEGALLY QUALIFIED CANDIDATES FOR FEDERAL OFFICE AND ALL AUTHORIZED COMMITTEES**

With another election season upon us, the FCC's Media Bureau takes this opportunity to remind broadcasters and the public about the FCC's lowest unit charge (LUC) requirements. As discussed below, the LUC requirements are applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office.

Section 73.1942 of the Commission's rules specifies that the charges made for the use of any broadcast station by a legally qualified candidate in connection with their campaign for nomination or election shall not exceed the LUC of the station for the same class and amount of time for the same period during 45 days preceding the date of a primary election and 60 days preceding the date of a general election.[1] Although section 73.1942 makes no reference to a legally qualified candidate's "authorized committee," section 315(b) of the Communications Act of 1934, as amended (Act), which section 73.1942 is intended to implement, repeatedly refers to candidates and their authorized committees as sharing the rights it confers.[2] Accordingly, the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees.[3]

To determine what qualifies as an authorized committee, the Commission relies on subsection 315(b)(2)(F) of the Act, which explicitly defines the term "authorized committee" as having the same meaning given to it by the Federal Election Campaign Act (FECA), *i.e.*, the principal campaign committee or any other political committee authorized and designated by a candidate to receive contributions or make expenditures on behalf of such candidate.[4] Additionally, although the FECA generally prohibits the designation as an authorized committee a political committee that supports more

[1] 47 CFR § 73.1942(a).

[2] *See* 47 U.S.C. § 315(b).

[3] *See In the Matter of Codification of the Commission's Political Programming Policies*, Memorandum Opinion and Order, 7 FCC Rcd 4611, 4614, para. 23 (1992).

[4] 47 U.S.C. § 315(b)(2)(F) ("authorized committee" has the meaning given such term by section 30101 of title 52"). *See* 52 U.S.C. § 30101(6) (defining the term "authorized committee" to mean "the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate"); 52 U.S.C. § 30102(e)(1) ("Each candidate for Federal office . . . shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. . . . A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate.").

than one candidate,[5] it provides an exception to allow candidates to designate as an authorized committee a political committee "established solely for the purpose of joint fundraising."[6] The FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under the FECA.

We also take this opportunity to restate previous Media Bureau guidance regarding LUC eligibility for candidate-party coordinated ads. Advertising time purchased by political parties as an independent expenditure is not entitled to LUC. These expenditures involve no coordination between the party and a candidate. By contrast, however, candidate-party coordinated advertisements are subject to the LUC provisions, provided that the ad otherwise complies with other applicable requirements in section 73.1942 of the Commission's rules and section 315(b) of the Act.[7]

Stations are always free to request documentation from parties to confirm that an entity purchasing time is eligible to receive LUC.

**-FCC-**

[5] 52 U.S.C. § 30102(e)(3)(A).

[6] 52 U.S.C. § 30102(e)(3)(A)(ii).

[7] *See, e.g.*, Colorado II at 1210 ("For example, independent expenditures do not qualify for the lowest rates on the purchase of broadcasting time, as coordinated expenditures would.").

# EXHIBIT B

NATIONAL ASSOCIATION OF BROADCASTERS

COUNSEL MEMO
FROM THE LEGAL DEPARTMENT

## POLITICAL ADVERTISING
## INDEPENDENT COMMITTEES AND "LUC" RATES

Many stations have encountered independent entities such as political action committees (PACs) or political parties, claiming to be "authorized" by a candidate and thus entitled to the "lowest unit charge" (LUC) for political advertising under Section 315(b) of the Communications Act of 1934 (47 U.S.C. § 315(b)). This question has also arisen in related litigation currently pending before the U.S. Supreme Court. This memo presents NAB staff's view of whether such claims, as a general matter, may be valid. This memo is not intended to provide legal advice on how the law or legal principles discussed herein may apply to a broadcast station's specific circumstances. Indeed, each station faces its own unique political and economic environment, and as such, the applicability of these views will vary based on the situation. Stations should seek the advice of their own attorneys when deciding whether an advertisement qualifies for the LUC.

NAB believes that, while a candidate's "authorized committee" is entitled to LUC, other entities are not. Specifically, under the applicable federal laws, a candidate's designated principal campaign committee is entitled to LUC rates, while "joint fundraising committees" and other "hybrid" committees are not. In fact, as detailed below, the Department of Justice, through the Solicitor General, recently reflected a similar view.

Although Section 315(b) only mentions LUC in the context of candidate ads, the FCC has historically interpreted the law to apply to both a "legally qualified candidate" and the "authorized committee of such candidate." Section 315(b)(2) states that an ad by a candidate and any "authorized committee" of the candidate that references an opponent for the same office is only entitled to the LUC if the ad includes the "stand by your ad" statement that the candidate has approved the ad. In a 1972 Public Notice, for instance, the FCC specifically denied that the LUC provision of Section 315(b)(1) applied to political broadcasts by groups, organizations, or persons other than candidates, stating: "The provision applies only to broadcasts by candidates for public office." Similarly, in a 1992 Memorandum Opinion and Order codifying its prior political programming policies, the FCC stated: "[W]e have always held that only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b). Thus, even if an independent entity produces an advertisement that includes an appearance by a candidate, that independent entity is not entitled to the LUC." Accordingly, it is not sufficient for candidate to "authorize" or approve any particular advertisement. For any

entity to claim an entitlement to LUC rates, the entity itself must be the "authorized committee" of a legally qualified candidate.

Section 315(b) defines "authorized committee" by referring to Section 30101 of the Federal Election Campaign Act (FECA) (52 U.S.C. § 30101). Section 30101 states that "[t]he term 'authorized committee' means the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate." Section 30102(e)(1), in turn, provides that each candidate shall designate a committee to serve as the "principal campaign committee of such candidate." The "principal campaign committee" is therefore an "authorized committee" within the meaning of both Section 30101 of the FECA and Section 315(b) of the Communications Act. Section 30102(e)(1) also provides that a candidate "may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate."

Section 30102(e)(3), however, generally limits the designation of additional committees as "authorized committees" to committees that exclusively support a single candidate. Paragraph (3) provides two exceptions to this limitation. First, a candidate for President nominated by a political party may designate the national committee of such political party as "a principal campaign committee."[1] Second, candidates "may designate a political committee established *solely for the purpose of joint fundraising* by such candidates as an authorized committee" (emphasis added). Thus, while such "joint fundraising committees" may be considered "authorized committees" under the FEC's rules, the plain language of the FECA limits their designation as an authorized committee *solely* to regulations regarding *fundraising*, not to any regulatory designations related to active campaigning or buying advertising. The Department of Justice, through the Solicitor General of the United States, essentially took this view in a 2025 filing with the United States Supreme Court, stating that the LUC rules "require broadcasters to charge low rates for candidate spending, ***but not for party spending—whether coordinated or independent***."[2]

NAB thus believes that, pursuant to the terms of Sections 30101 and 30102 of the FECA, only a candidate's designated principal campaign committee is entitled to LUC rates, while "joint fundraising committees" and other "hybrid" committees are not "authorized committees" eligible for LUC rates under Section 315(b) of the Communications Act.[3]

---

[1] This, of course, is applicable only to Presidential candidates and, under the terms of Section 30102(e)(3), only where the national committee maintains separate maintains separate books of account with respect to its function as a principal campaign committee.
[2] *Reply Brief for the Federal Respondents at 23, National Republican Senatorial Committee, et al., Petitioners, v. FEC, et al.*, No. 24-261, 2025 WL 3068193 (Oct. 1, 2025) (emphasis added). The Solicitor General added, "Parties could spend more money on advertisements, but broadcasters still would not be required to charge parties special low rates." *Id.*
[3] Note that, as of the date of this writing, the Supreme Court has agreed to hear arguments in a case brought by National Republican Senatorial Committee and others as to whether the First Amendment permits the government to restrict political parties from spending money on

In addition, because the key definition of "authorized committee" is tied to federal campaign finance limitations, it appears that these exceptions are limited to the narrow category of federal candidate committees. Nothing in the FECA, the Communications Act, or the FCC's rules or published cases suggests that these exceptions extend to state or local political parties, or other groups that are purportedly authorized by a state or local candidate. Thus, even if such parties claim to be "authorized" to act for a candidate under state or local law, it does not appear that they would qualify for LUC status under federal law.

*NAB's Counsel Memos are intended to serve as a source of general information on legal issues of interest to the broadcast industry. Broadcasters seeking information on how the principles discussed in a Counsel Memo apply to their specific circumstances should seek the advice of their own attorneys.*

---

campaign advertising with input from the party's candidate for office. (*National Republican Senatorial Committee, et. al. v. FEC, et. al*., 117 F.4th 389 (6th Cir. 2024), *cert. granted,* 2025 WL 1787717 (U.S. Jun. 30, 2025) (No. 24-261).) While some have suggested that the Court's decision in this case may broaden the scope of entities entitled to LUC rates, neither the issues to be addressed in the case nor Section 315(b) of the Communications Act appear to support such an outcome. Indeed, the Solicitor General of the United States has already explicitly denied that the Court's decision will impact LUC rates, stating "[p]arties could spend more money on advertisements, but broadcasters still would not be required to charge parties special low rates." (*Reply Brief for the Federal Respondents at 23, National Republican Senatorial Committee, et al., Petitioners, v. FEC, et al.*, No. 24-261, 2025 WL 3068193 (Oct. 1, 2025).)

Federal Communications Commission
Office of General Counsel—Litigation Division
45 L Street NE • Washington, DC 20554
Tel: (202) 418-1740 • Fax: (202) 418-2819

August 17, 2026

Nwamaka Anowi, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219

Re: *Sherrod Brown, et al. v. FCC & USA*, No. 26-1785 (argued Aug. 7, 2026)

Dear Ms. Anowi:

In briefing and at argument, Respondents presented several threshold arguments, including that the challenged Public Notice was not a final Commission order and did not alter the regulatory status quo. Pursuant to Federal Rule of Appellate Procedure 28(j), the FCC now writes to update the Court on two developments that provide additional support for dismissal of Petitioners' untimely attempt to alter the regulatory status quo.

First, on August 13, the FCC's Media Bureau issued an order dismissing a petition for reconsideration of the challenged Public Notice filed by the Television Bureau of Advertising, Inc. *See Order on Reconsideration*, DA 26-851 (Media Bur. Aug. 13, 2026) (copy attached). The Bureau's *Order on Reconsideration* makes clear that, in merely "restat[ing] previous Media Bureau guidance," the Public Notice "broke no new ground"; it "simply collects in one place prior FCC orders and other relevant authority." *Id.* ¶¶ 2, 4, 7, 10, 12–14. "[N]othing in the Public Notice … reopens or otherwise creates a new opportunity to challenge the agency's prior determinations." *Id.* ¶ 12.

Second, on August 14, the FCC Chairman circulated a proposed order on the application for Commission review filed by Petitioners here. The Commissioners may now vote on that proposed order.[1] We have been authorized to disclose that the proposed order would also dismiss the application as an improper vehicle for revisiting existing law on the eve of an election, after primaries have occurred and plans have been made for the general election based on the existing rules.

---

1 FCC, Items on Circulation, https://www.fcc.gov/items-on-circulation.

Neither the *Order on Reconsideration* nor the proposed order would alter parties' ability to bring case-specific disputes about the application of the "lowest unit charge" to the FCC for adjudication. And parties that wish for the Commission to reexamine past agency rules or guidance concerning the lowest unit charge would remain free to submit petitions for rulemaking or declaratory ruling for consideration in the normal course.

These administrative developments, which demonstrate that Petitioners sought review of a document that merely reminded the public of existing obligations, support Respondents' position that Petitioners' challenge should be dismissed.

Respectfully submitted,

/s/ *Scott M. Noveck*

Jacob M. Lewis
*Associate General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Scott M. Noveck
*Counsel*

(Enclosure)

cc: All counsel (via CM/ECF)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Entitlement to Lowest Unit Charge for Legally | ) |
| Qualified Candidates for Federal Office and All | ) |
| Authorized Committees | ) |

**ORDER ON RECONSIDERATION**

**Adopted: August 13, 2026** **Released: August 13, 2026**

By the Acting Chief, Media Bureau:

## I. INTRODUCTION

1. In this *Order on Reconsideration*, we consider a petition from the Television Bureau of Advertising, Inc. (TVB) for reconsideration of the Media Bureau's March 2026 public notice reminding broadcasters and the public about the FCC's "lowest unit charge" (LUC) requirements.[1] For the reasons stated below, we dismiss TVB's request for reconsideration.[2]

2. First, TVB argues that the Bureau's Public Notice broke new substantive ground, and their Petition thus seeks reconsideration of what they contend is a new and final agency action. As explained below, however, that premise is incorrect. The Public Notice merely reminds the public, going into an election season, of the agency's longstanding and previous decisions regarding the scope of LUC obligations. It simply collects in one place prior FCC orders and other relevant authority so that a wide range of stakeholders can be aware of existing law. Such a reminder is not a decision or action that can be challenged through a petition for reconsideration.

3. Second, and given the above, insofar as TVB's Petition takes issue with prior agency guidance, the time for challenging that prior guidance has passed.[3] Moreover, there is nothing in the Public Notice that reopened those issues or underlying guidance sufficient to provide TVB with a right to challenge them through a petition for reconsideration of the Public Notice. Likewise, insofar as TVB appears to take issue with the longstanding definition of "authorized committee," which comes from 52 U.S.C. §§ 30101-30102, they are seeking the wrong type of relief in the wrong forum. Changing that definition is an issue for Congress, or the Federal Election Commission (FEC) through its implementing rules, to decide.

4. Third, we note that existing industry practice comports with the FCC's existing interpretations of the LUC requirements. This further confirms that the Public Notice broke no new ground; it did not change the status quo. As always, if there are particular instances in which a party

[1] *FCC Media Bureau Provides Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, Public Notice, DA 26-300, 2026 WL 1013722 (MB Mar. 30, 2026) (Public Notice); Petition for Reconsideration or, In the Alternative, for Declaratory Ruling of the Television Bureau of Advertising, Inc. (Apr. 29, 2026) (Petition).

[2] We defer action on TVB's alternative request for a declaratory ruling and do not address it in this *Order on Reconsideration*.

[3] As indicated elsewhere in this document, parties can challenge the application vel non of the LUC in a particular case based on particular facts.

wishes to challenge a station's application of the LUC in a specific case, the agency can adjudicate those disputes on a case-by-case basis consistent with FCC precedent.[4]

## II. BACKGROUND

5. Under section 315(b) of the Communications Act, during the period immediately preceding an election, any "use" of broadcast airtime for campaign advertisements "by any person who is a legally qualified candidate for any public office" must receive the "lowest unit charge" that the station offers for that airtime.[5] The statute directs the Commission to "prescribe appropriate rules and regulations to carry out" that requirement.[6] The Commission has accordingly implemented section 315(b) of the Act in section 73.1942 of its rules,[7] and in various other rules and orders.[8]

6. Neither section 315 of the Act nor section 73.1942 of the Commission's rules specifies what "use" of broadcast airtime "by" a candidate entails. But as TVB repeatedly acknowledges, the Commission and industry have long recognized the Commission that the LUC entitlement extends to both candidates and their principal campaign committees.[9] And previous Media Bureau guidance, in response to informal inquiries from regulated parties, has established candidate-party coordinated advertisements as eligible for the LUC rate.

7. In the Public Notice, the Bureau broke no new ground. Rather, consistent with the longstanding, undisputed recognition that principal campaign committees are eligible for the LUC, and with section 315(b)(2)(F) of the Act, the Bureau explained that "[t]o determine what qualifies as an authorized committee," the Commission is bound by the meaning given that term by the Federal Election Campaign Act (FECA).[10] Accordingly, the Bureau stated that "joint fundraising committee[s]"—committees authorized to raise funds jointly with other candidates, committees, or organizations—are entitled to the LUC rate when purchasing airtime for use by a participating candidate.[11]

8. In addition, the Public Notice includes a reminder that "candidate-party coordinated ads," in which a candidate uses airtime jointly with his or her political party's national or state committee to broadcast "advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office," are entitled to the LUC.[12]

9. In the Petition, TVB asserts that "[f]or more than five decades, broadcasters, candidates, parties, [Political Action Committees], and other participants in the political advertising marketplace all understood, under the Act and FCC rules, that only a candidate and their singular designated principal campaign committee were entitled to the LUC."[13] On this premise, TVB contends that the Public Notice

---

[4] *See Exclusive Jurisdiction With Respect To Violations of the Lowest Unit Charge Requirements of Section 315(b) of the Communications Act of 1934, As Amended*, 6 FCC Rcd 7511, 7513-14, paras. 21-26 (1991) (outlining complaint procedures).

[5] 47 U.S.C. § 315(b).

[6] *Id.* § 315(d).

[7] 47 CFR 73.1942.

[8] *E.g.*, *id.* § 76.206; *The Law of Political Broadcasting & Cablecasting: Political Primer*, Update to 1978 Public Notice and Primer, 100 F.C.C.2d 1476 (1984) (*Political Primer*); *Codification of the Commission's Political Programming Policies*, Memorandum Opinion and Order, 7 FCC Rcd 4611 (1992) (*1992 Political Programming Order*), *reconsideration granted*, Memorandum Opinion and Order, 9 FCC Rcd 651 (1994).

[9] *See, e.g.*, Pet. at 2, 4 (recognizing that principal campaign committees are eligible for the LUC).

[10] Public Notice, at 1 (citing 47 U.S.C. § 315(b)(2)(F)).

[11] *Id.* at 2.

[12] *Id.* at 1-2.

[13] Pet. at 4.

"set[s] forth new substantive LUC requirements" without notice and comment required under the Administrative Procedure Act, and otherwise violates the Constitution and federal law.[14]

## III. DISCUSSION

10. The central premise of TVB's Petition—that the Public Notice announces "new political broadcasting requirements" that would "upend" existing practice[15]—is wrong many times over.

11. As an initial matter, the Public Notice does not adopt any new rules or requirements. Instead, it simply "remind[s] broadcasters and the public" about the FCC's existing LUC requirements and "restate[s] previous Media Bureau guidance," to ensure that broadcasters and the public are aware, going into an election season, of how the FCC has previously interpreted the LUC requirements.[16] The FCC routinely provides these types of reminders. Therefore, we dismiss the Petition because the Public Notice is not the type of action that can be challenged through a petition for reconsideration.

12. TVB's real issue appears to be with past agency guidance. But the time for filing petitions for reconsideration or otherwise challenging earlier guidance has long since passed. Moreover, there is nothing in the Public Notice that reopens or otherwise creates a new opportunity to challenge the agency's prior determinations. TVB's Petition is thus an untimely attempt to challenge prior agency actions.[17]

13. In addition, the underlying LUC requirements established in law and in prior FCC guidance comport with existing industry practice. This confirms that the Public Notice broke no new ground, but merely summarized the status quo.

14. Candidate-party coordinated ads. The Public Notice's discussion of candidate-party coordinated ads takes no new action and breaks no new ground, but merely "restate[s] previous Media Bureau guidance regarding LUC eligibility."[18] Indeed, contrary to TVB's unsupported assertion, the prevailing practice among broadcasters has been to make the LUC available for party-coordinated ads for well over a decade. That practice is reflected in the National Association of Broadcasters' *Political Broadcasting Handbook* (formerly known as the *Political Broadcasting Catechism*), which recognizes that "[t]he national political parties and their campaign committee[s] have limited 'hard money' funds; ads paid for from those funds can be coordinated with a federal candidate and would, if they are, be entitled to the LUC."[19]

15. Joint Fundraising Committees. The Public Notice also correctly recognizes that the Commission has long treated "both candidates and their authorized campaign committees" as eligible for the LUC.[20] TVB does not dispute this, but contends that only the "designated principal campaign committee" can be an LUC-eligible "authorized committee."[21]

---

[14] *Id.* at 13; *see generally* Petition at 2-24.

[15] *Id.* at 4, 13.

[16] Public Notice at 1-2.

[17] Notably, too, the Commission would be afforded deference to reasonable interpretations of its own rules under *Kisor v. Wilkie*, 588 U.S. 558 (2019), which was not overturned by *Loper Bright Enterprise v. Raimondo*, 603 U.S. 369 (2024).

[18] *Id.* at 2. That these prior rulings have largely taken the form of informal oral opinions, *see Political Primer* at 1478, para. 5, does not change the fact that the *Public Notice* did no more than restate past guidance and took no new action.

[19] Nat'l Ass'n of Broads., *Political Broadcasting Catechism* 36 (18th ed. 2014); *accord* Nat'l Ass'n of Broads., *Political Broadcasting Handbook* 19 (19th ed. 2024).

[20] *Id.* at 1.

[21] Pet. at 21.

16. The Public Notice makes plain why that is wrong. Subsection 315(b)(2)(F) of the Act "explicitly defines the term 'authorized committee' as having the same meaning" assigned by FECA.[22] The Commission is thus bound to apply FECA's definition of "authorized committee" when interpreting the LUC requirement.[23] And Joint Fundraising Committees are "authorized committees" under FECA.[24] TVB appears to take issue with the longstanding definition of "authorized committee," which comes from 52 U.S.C. §§ 30101-30102. But once again, a petition for reconsideration of the Public Notice is not the right vehicle for the relief that TVB seeks. If TVB wants to change the definition of "authorized committee," then it must ask Congress to amend section 30101 of FECA, or the FEC to amend its implementing rules. In the meantime, the FCC is obligated to follow FECA as Congress has enacted it and the FEC implements it.

17. In acknowledging that the governing definition of "authorized committee" extends to Joint Fundraising Committees, the Public Notice does not expand the "universe" of committees eligible for the LUC, as TVB contends. Although it is true that Joint Fundraising Committees are a relatively new type of authorized committee, the existing practice of broadcasters with respect to these committees has been to regard them as eligible for the LUC, consistent with the Public Notice.[25] In any event, if parties wish to change the definition of "authorized committee," they must ask Congress to amend FECA.

18. Finally, we take this opportunity to remind the public that any disputes regarding application of the LUC in any specific instance can be adjudicated by the FCC on a case-by-case basis, consistent with agency's precedent and practice.[26]

## IV. ORDERING CLAUSES

19. For the foregoing reasons, and to the extent set forth above,[27] **IT IS ORDERED** that, pursuant to Section 405 of the Communications Act of 1934, as amended, 47 U.S.C. § 405, and section 1.106 of the Commission's rules, 47 CFR § 1.106, the Petition for Reconsideration dated April 29, 2026, by the Television Bureau of Advertising, Inc., is **DISMISSED**.

20. **IT IS FURTHER ORDERED** that this Order on Reconsideration **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

Alexander Sanjenis
Acting Chief, Media Bureau

---

[22] Public Notice at 1 (citing 47 U.S.C. § 315(b)(2)(F)).

[23] *Id.* at 1-2.

[24] *See* 52 U.S.C. § 30102(e)(3)(A)(ii); *see also id.* § 30101(6) ("The term 'authorized committee' means the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) . . . to receive contributions or make expenditures on behalf of such candidate."); *id.* § 30102(e)(1).

[25] *See* Br. of Intervenors NRCC & NRSC, *Brown v. FCC*, No. 26-1785 (4th Cir. filed July 20, 2026); Br. of Nat'l Media Rsch. Planning & Placement et al., *Brown v. FCC*, No. 26-1785 (4th Cir. filed July 24 , 2026).

[26] *See supra* notes 3, 4.

[27] As noted, *see supra* note 2, we defer action on TVB's alternative request for a declaratory ruling.

FC NEWS from the Office of Commissioner Anna M. Gomez

**Media Contact:**
Gomez.Press@fcc.gov

**For Immediate Release**
**August 25, 2026**

# FCC TO UNLEASH FLOOD OF DARK MONEY INTO BROADCAST ADVERTISING AHEAD OF MIDTERM ELECTION

WASHINGTON — FCC Commissioner Anna M. Gomez issued the following statement in response to a Media Bureau Order unlawfully expanding the interpretation of which political entities qualify for discounted broadcast advertising rates, which will now allow joint fundraising committees and party committees to purchase airtime at the same steep discount the law provides only for candidates, just weeks before voting starts in the fall general midterm election. The discount window opens September 4, 2026:

"In the final stretch of a national election, this FCC is unleashing a flood of coordinated campaign money into broadcast advertising, just as the Supreme Court has cleared the way for unlimited coordinated spending between parties and candidates. This unprecedented, last-minute decision gives the biggest political spenders an even bigger advantage over everyone else by expanding the candidate-only discount established by law to joint fundraising and party committees, an advantage that will make it hard for anyone else to catch up before Election Day. Broadcasters are being directed to slash prices and sell their most valuable inventory during their busiest and most lucrative season, even as this same FCC has spent months arguing broadcasters need economic and regulatory relief to compete with Big Tech and streaming. You cannot claim broadcasters are struggling to survive and then force them into a fire sale on the one thing that could actually help them compete and increase revenue.

"Even more concerning, this decision was made behind closed doors by agency staff, not by the full Commission, and it contradicts what this administration itself told the Supreme Court less than a year ago about who qualifies for this discount.[1] In direct conflict with the administration's position, the FCC relies on alleged staff-level guidance that was never provided in writing and that nobody could find, and adopted it with no opportunity for the public to weigh in. The American people should not have sweeping election-year rule changes forced on them in the dark, on the eve of an election, without a single opportunity for public input. It is past time this Commission listens to them, not to the

[1] *See*, Application for Review at 5 ("{I]n connection with the litigation over the constitutionality of the party coordinated expenditure limits in *NRSC v. FEC*, the Solicitor General argued in his reply brief that the Communications Act "require[s] broadcasters to charge low rates for candidate spending, *but not for party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC v. FEC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added)."); *see also,* Petition for Reconsideration at 10.

billionaires seeking to empty their pockets into dark money groups to try to influence the outcome of this upcoming election."

**<u>Background:</u>**

The Media Bureau issued a Public Notice expanding the interpretation of which entities qualify for the lowest unit charge on broadcast political advertising. This change was made by agency staff, not through a full Commission vote. There was no public input, no notice and comment, no docket, no way for the public to track proposed changes from proposal to implementation the way they do with agency rules.

The Television Bureau of Advertising, a trade association representing local broadcast stations, filed a challenge with the Bureau, which the Bureau dismissed. Separately, four candidates for federal office in Ohio, Georgia, North Carolina, and Michigan filed their own challenge with the full Commission, which remains pending. In neither case has the public had any opportunity to weigh in, and the underlying record remained unavailable for public review until it was included in Commissioner Gomez's dissent.

A full copy of Commissioner Gomez's dissent to the Media Bureau Order can be found here.

###

Office of Commissioner Anna M. Gomez: (202) 418-2100
ASL Videophone: (844) 432-2275
www.fcc.gov/leadership/anna-gomez

*This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action. See MCI v. FCC, 515 F.2d 385 (D.C. Cir. 1974).*

**STATEMENT OF**
**COMMISSIONER ANNA M. GOMEZ**

Re: *Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, Order on Reconsideration of Public Notice (DA 26-851), released August 13, 2026.

The establishment of rules through a bureau-level public notice to remind the public of unwritten guidance given by a former FCC staff member on how to interpret interrelated statutes is neither legal nor an established FCC practice. That is because it is not reasoned decision-making, and there is no precedent for such action.

As a starting point, it is important to understand the significance of the action at issue. The Commission is not always unanimous, so it is notable that we are with regard to the fact that the legacy broadcast industry has been upended by the advent and growth of digital advertising and the resulting reduction in legacy broadcast advertising revenues.[1] The direct result of the public notice (PN) "reminding" broadcasters how they should construe which entities are entitled to the lowest unit charge (LUC) required by statute (LUC PN)[2] will be a decrease in critical advertising revenues earned by broadcasters during a short window of time that starts next week.

As indicated by the parties challenging the LUC PN, this action will have a substantial negative impact on both the broadcasters that will be required to provide reduced pricing to an expanded group of campaign committees[3] in addition to the entities, legally qualified candidates, that the statute is intended to benefit.[4] Broadcasters have a limited window of time to sell election-related advertising, which makes up a disproportionate percentage of their shrinking slice of the advertising revenue pie,[5] and requiring that they sell at lowered rates to an expanded list of entities will lower their revenues. Likewise, candidates need to compete in their communities during the crucial last 60 days of an election cycle. As documented by Applicants, the newly

---

[1] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, (2026) (statement of Chairman Brendan Carr), https://docs.fcc.gov/public/attachments/DOC-424076A2.pdf; (statement of Commissioner Anna M. Gomez), https://docs.fcc.gov/public/attachments/DOC-424076A3.pdf; (statement of Commissioner Olivia Trusty), https://docs.fcc.gov/public/attachments/DOC-424076A4.pdf.

[2] *FCC Media Bureau Provides Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, Public Notice, DA 26-300, 2026 WL 1013722 (MB Mar. 30, 2026) (*Order on Reconsideration*).

[3] Petition for Reconsideration or, In the Alternative, for Declaratory Ruling of the Television Bureau of Advertising (Petitioners), Inc. (Apr. 29, 2026) (*Petition for Reconsideration*). The Petition for Reconsideration is attached to this statement as Attachment 1.

[4] Application for Review filed by Sherrod Brown, Jon Ossoff, Roy Cooper, and Kristen McDonald Rivet (Applicants) of a Public Notice issued by the Media Bureau on March 30, 2026 at 9-10 (*Application for Review*). The Application for Review is attached to this statement as Attachment 2.

[5] *See* National Association of Broadcasters Comments, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, at 14, Docket No. 17-318 (filed August 4, 2025).

announced interpretation of the LUC will significantly increase the volume of broadcast advertising that can be bought with campaign dollars in this election cycle, which could, in fact, impact the outcome of the election.[6]

Nothing about this proceeding was handled correctly. The Media Bureau, without seeking comment, released a public notice purporting to restate existing legal authority.[7] The Order on Reconsideration characterizes the LUC PN as merely restating existing legal authority and, on that basis, dismisses the substantive challenges as procedurally defective.[8] There is, however, no citation to a substantive Commission action as a source of the "rule" at issue. Instead, there is a citation to a rule providing that broadcasters may seek an oral opinion or ruling from staff.[9] Based on the allowed practice that provides a means for individual entities to seek guidance on specific facts, the Media Bureau asserts that unwritten informal guidance provided by Media Bureau staff at some unidentified point in the past created "existing legal authority" about which the LUC PN is merely reminding broadcasters.[10] The LUC PN relies on such informal guidance and then the Order on Reconsideration relies on the LUC PN. "Existing legal authority" cannot lawfully be created out of thin air in this manner.

The substantive precedent on which the Commission relies for the interpretation and application of complex interrelated statutes is unwritten informal guidance. While an individual broadcaster or its customer may be allowed to rely on unwritten informal guidance in its individual actions, this unwritten informal guidance is being treated here as an established generally applicable rule. Even setting aside the wholesale lack of notice and comment and final appealable order published in the Federal Register, the Media Bureau does not have the authority to adopt generally applicable rules because such action would be new and novel and outside of its delegated authority.[11]

Notably, the Media Bureau failed to seek public comment on the Petition for Reconsideration at issue here, as well as the Application for Review. Nor did it create a docket or other file number that the public could use to locate and track related filings in the Commission's Electronic Comment Filing System (ECFS). That is not the normal process and, accordingly, I have

---

[6] *Application for Review* at 17-19.

[7] LUC PN.

[8] *Order on Reconsideration* at para. 2.

[9] *Order on Reconsideration* at para. 14 (asserting "[t]hat these prior rulings have largely taken the form of informal oral opinions . . . does not change the fact that the *Public Notice* did no more than restate past guidance and took no new action." citing *The Law of Political Broadcasting & Cablecasting: Political Primer*, Update to 1978 Public Notice and Primer, 100 F.C.C.2d 1476, 478, para. 5 (1984) (*Political Primer*) (which provides for parties to "obtain an oral staff opinion or ruling by placing a telephone call to" the Media Bureau' s political programming staff)).

[10] *Order on Reconsideration* at para. 11-13.

[11] 47 U.S.C. § 155(c); 47 C.F.R. §§ 0.61, 0.283(a) and (c).

attached copies of both the Petition for Reconsideration and the Application for Review to this statement.

Significant legal issues were raised in both the Petition for Reconsideration and the Application for Review that were not adequately addressed, if at all, in the Order on Reconsideration. These include, but are not limited to, a complex analysis of the distinctions between sections (b)(1) and (b)(2) of 47 U.S.C. § 315,[12] serious questions about whether the expanded interpretation violates either the First Amendment or the Takings Clause of the Constitution,[13] and the contradiction between the LUC PN and the U.S. Solicitor General's statement to the Supreme Court that the Communications Act "require[s] broadcasters to charge low rates for candidate spending, but not for party spending—whether coordinated or independent."[14] Again, the Media Bureau did not seek comment on these questions.

The Order on Reconsideration asserts further that there are adequate processes available for parties to challenge the substance of the LUC PN because any specific disputes can be adjudicated on a case-by-case basis.[15] This assertion ignores the very time-sensitive and serious facts before us in this case. The 60-day window at issue opens next week. This 60-day window is critical to both broadcasters and candidates for distinct reasons that are reflected in their filings.[16] The process identified by the Media Bureau will not address the issues raised in a timely manner.

For all of the above reasons, I dissent.

---

[12] *See Petition for Reconsideration* at pp. 4-6 and *Application for Review* at pp. 10-17. Section 315(b) has multiple subparts that do more than one thing. The Commission conflates them and fails to address the serious statutory construction challenge that is being made to a rule that it is implementing without notice and comment.

[13] *See Petition for Reconsideration* at pp. 15-16, 17-24.

[14] *See Application for Review* at 5 ("{I]n connection with the litigation over the constitutionality of the party coordinated expenditure limits in *NRSC v. FEC*, the Solicitor General argued in his reply brief that the Communications Act "require[s] broadcasters to charge low rates for candidate spending, *but not for party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC v. FEC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added)."); *see also Petition for Reconsideration* at 10.

[15] *Order on Reconsideration* at para. 14.

[16] *See Petition for Reconsideration* and *Application for Review*.

# Attachment 1

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Entitlement to Lowest Unit Charge for Legally | ) | Docket No. ______ |
| Qualified Candidates for Federal Office and All | ) | |
| Authorized Committees | ) | DA 26-300 |

**PETITION FOR RECONSIDERATION OR, IN THE ALTERNATIVE,**
**FOR DECLARATORY RULING OF**
**THE TELEVISION BUREAU OF ADVERTISING, INC.**


Brad Seitter
President & Chief Executive Officer
**Television Bureau of Advertising, Inc.**
120 Wall Street
15th Floor
New York NY 10005
(212) 486-1111


April 29, 2026

## TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT ..... 2

II. THE PUBLIC NOTICE UPENDS DECADES OF PRACTICE AS TO THE SCOPE OF THE LUC AND IMPROPERLY EXPANDS THE FCC'S RULES AT THE BUREAU LEVEL ..... 4

III. THE NOTICE'S DEFICIENT ANALYSIS OF THE ACT AND FECA FAILS TO JUSTIFY ITS VAST EXPANSION OF THE LUC ..... 6

IV. THE NOTICE'S ANNOUNCEMENT OF NEW POLITICAL BROADCASTING REQUIREMENTS UNDER THE PRETENSE OF A "REMINDER" VIOLATES THE APA ..... 13

V. THE LUC PROVISIONS ARE CONTRARY TO THE FIRST AMENDMENT AND THE NOTICE'S SUBSTANTIAL EXPANSION OF THEM EXACERBATES THEIR UNCONSTITUTIONALITY ..... 17

A. The LUC Provisions Cannot Withstand First Amendment Scrutiny ..... 17

B. Broadcasting is Entitled to Full First Amendment Protections ..... 21

VI. FAILURE TO TAKE PROMPT ACTION ON THIS PETITION WILL NECESSITATE JUDICIAL REVIEW OF THE FCC'S MAJOR EXPANSION OF THE LUC REQUIREMENTS ..... 24

VII. CONCLUSION ..... 25

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees | ) ) ) | Docket No. ______ DA 26-300 |

**PETITION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR DECLARATORY RULING OF THE TELEVISION BUREAU OF ADVERTISING, INC.**

Pursuant to § 1.106 and § 1.2 of the Federal Communications Commission's (Commission or FCC) rules,[1] the Television Bureau of Advertising, Inc. (TVB) (Petitioner)[2] hereby files this petition for reconsideration or, in the alternative, for declaratory ruling. We respectfully request that the Media Bureau and/or Commission (collectively, FCC) abrogate a recent Public Notice of the Bureau purporting to "remind broadcasters and the public" that the lowest unit charge (LUC) requirements apply to all "authorized committees," including those

[1] 47 C.F.R. §§ 1.106, 1.2.

[2] TVB is the not-for-profit trade association representing America's local broadcast television industry, including linear and digital platforms. Its members include U.S. television stations, television broadcast groups, advertising sales reps, syndicators, international broadcasters, and associate members. Those members are subject to LUC requirements and rules. TVB actively promotes local media marketing solutions to the advertising community and works to develop advertising dollars for the medium's multiple platforms, including on-air, online, and mobile. The association and its members are directly impacted by the Public Notice at issue in this filing because it would further artificially and unlawfully depress the rates TVB's members could charge for their advertising inventory, beyond what existing LUC requirements already do. Those depressed rates cause significant economic harm to TVB's members. And if the Supreme Court rules in a pending case that limits on coordinated spending are unconstitutional, "[b]roadcasters across the country will face significant increases in advertisements that purport to qualify for lowest unit rates," inflicting even greater economic harm. *Brief for Intervenor-Respondents DNC, DSCC, and DCCC*, at 48, *Nat'l Republican Senatorial Comm. (NRSC), et al., v. Federal Election Commission (FEC), et al.*, No. 24-261 (Sept. 29, 2025).

that engage in joint fundraising with legally qualified candidates for federal office.[3] Under governing law, longstanding precedent, and the position of the U.S. Department of Justice, only a candidate's designated principal campaign committee is entitled to LUC rates, while other types of joint or hybrid committees are not. The Notice thus purports to cement a substantial expansion of the LUC that is contrary to statute, procedurally defective, and unconstitutional. Moreover, this unlawful expansion exemplifies why the LUC statute and the FCC's implementing rules violate the First Amendment, and why the FCC should decline to enforce its LUC rules going forward. Failure to take prompt action on this petition and to repudiate the Public Notice will necessitate judicial review.

## I. SUMMARY OF ARGUMENT

The FCC must promptly reconsider and repeal the Bureau's Public Notice. The Notice errs by declaring that Section 315(b) of the Communications Act of 1934 (Act) and referenced provisions of the Federal Election Campaign Act of 1971 (FECA) extend LUC requirements to the ads of any and all political party committees, political action committees (PACs), or other entities that might conceivably have an "authorized" label attached. The Bureau's novel position also ignores the statutory and regulatory limitation of the LUC to ads ***by candidates*** "in connection with" their campaigns, as set forth in Section 315(b)(1) of the Act and Section 73.1942(a) of the FCC's rules. Under this clear language, political party, PAC, or coordinated ads focused on political issues or general fundraising, rather than a single candidate's specific campaign, do not qualify for the LUC. The Notice is also procedurally deficient. While the Public Notice purports to "remind" broadcasters and the public of a pre-existing rule, it actually

[3] FCC Public Notice, *FCC Media Bureau Provides Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, DA 26-300 (Mar. 30, 2026) (Notice or Public Notice). LUC rates give candidates the benefits of all discounts offered by a station for the same class and amount of time, without regard to the frequency of the candidate's advertising.

reflects a newly-announced expansion of the LUC rule that should have been considered (if at all) by the full Commission, rather than the Bureau, and in compliance with the notice-and-comment requirements of Section 553 of the Administrative Procedure Act (APA).

The Public Notice also contravenes the First Amendment. The LUC provisions in statute and in rules are discriminatory content-based and speaker-based regulations of speech that cannot withstand First Amendment scrutiny. In addition, the LUC provisions impermissibly infringe broadcasters' own speech and programming decisions. The FCC therefore should determine to no longer enforce Section 73.1942 of its rules, especially given its repudiation nearly 40 years ago of the spectrum scarcity rationale for affording broadcasters reduced constitutional protections. Whatever its legitimacy as an initial matter, the spectrum scarcity rationale has been overcome by the explosion in platform and outlet options in the current media environment. At the least, the FCC must promptly abrogate the Public Notice and its expansion of the LUC requirements as unconstitutional, as well as contrary to statute and procedurally defective. To remove the uncertainty and chill created by the Notice's extension of the LUC in the midst of this political season, the FCC also must confirm that only a candidate and the candidate's designated principal campaign committee are entitled to the LUC.

The March 30 Public Notice is already inflicting both economic and First Amendment harm on broadcasters and other TVB members because of the confusion it has created.[4] The FCC's failure to promptly repudiate and remove that Notice will necessitate judicial review of the FCC's new position on the applicability of the LUC.

[4] *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 155, 164 (2014) (recognizing that the "chill[]" caused by "the threat of future enforcement" of speech restrictions inflicts First Amendment harms).

## II. THE PUBLIC NOTICE UPENDS DECADES OF PRACTICE AS TO THE SCOPE OF THE LUC AND IMPROPERLY EXPANDS THE FCC'S RULES AT THE BUREAU LEVEL

For more than five decades, broadcasters, candidates, parties, PACs, and other participants in the political advertising marketplace all understood, under the Act and FCC rules, that only a candidate and their singular designated principal campaign committee were entitled to the LUC. Now, a rapidly growing universe of hybrid committees, joint committees, and other entities are stretching the imprecise wording of Section 315(b)(2) to claim they are "authorized" by a candidate to receive the LUC for political ads, even for ads unconnected to the candidate's specific election campaign. Stations also increasingly receive requests for preferential LUC rates from multiple campaign committees claiming to be authorized by a single candidate. Essentially, these new kinds of party committees and PACs are impersonating a candidate's designated principal campaign committee to avail themselves of the special rates intended by Congress only for candidate ads, and not for issue ads in disguise. These claims have caused real harms by increasing confusion in the political advertising marketplace and creating an untenable environment for broadcast stations seeking to fulfill their obligation to provide reasonable access at LUC rates for legitimately entitled buyers of ads for legally qualified candidates.

The supposedly "authorized" committees stake their claims to the LUC on flawed interpretations of Section 315(b) of the Act and the FCC's LUC rule. Specifically, Section 73.1942(a) of the rules mirrors the text of Section 315(b)(1), and both state that the "charges" made for "the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his or her campaign for nomination for election, or election, . . . shall not exceed" the LUC.[5] The statutory provision that first established the LUC in

[5] 47 C.F.R. § 73.1942(a); 47 U.S.C. § 315(b)(1). FECA amended Section 315(b) of the Act to add the LUC provision.

1971 and the FCC's implementing rule make clear that LUC ad rates are for candidates, rather than other political entities, and do not mention "authorized committees" at all. Over 30 years later in the Bipartisan Campaign Reform Act of 2002 (BCRA), Congress amended Section 315(b) of the Act by adding subsection (b)(2) that placed conditions on Federal candidates' entitlement to the LUC. Section 315(b)(2)(A) provides that a Federal candidate shall not be entitled to the LUC for a political ad unless the candidate certifies "that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office" in such an ad, "unless such reference meets" the content and appearance requirements in Section 315(b)(2) for a candidate's "stand by your ad" statement (i.e., "I approve this message").[6]

Given these developments, Petitioner submits that the traditional practice of applying the LUC only to the campaign-connected ads of a candidate or their designated principal campaign committee should be reconfirmed as consistent with the Act and the FCC's LUC rule, Section 73.1942. Unfortunately, the Bureau's Public Notice did the exact opposite by significantly expanding the LUC rule to myriad types of committees and ads to which the rule did not previously apply.

Notably, the Bureau mischaracterizes the Notice as mere "guidance" that "reminds" broadcasters and the public about the LUC requirements.[7] But the Bureau does not cite any Commission orders, Bureau decisions, published decisions, or even earlier Public Notices to support its new claims about the breadth of the LUC's application – because there are none. And

[6] 47 U.S.C. § 315(b)(2)(A). Similarly, if a "candidate for Federal office (or any authorized committee of such candidate)" refers to an opposing candidate without meeting the "stand by your ad" requirements, then the candidate shall not be entitled to the LUC. 47 U.S.C. § 315(b)(2)(B). The content and appearance requirements of the "stand by your ad" messages for broadcast ads are set forth in §§ 315(b)(2)(C) & (D).

[7] Notice at 1.

the Bureau explicitly calls the Notice an "opportunity to restate previous Media Bureau guidance regarding LUC eligibility for candidate-party coordinated ads," but tellingly fails to cite any such previous guidance.[8]

In reality, the Public Notice announces expanded, substantive legal requirements under the LUC rule that presumably can be enforced against broadcasters for alleged noncompliance. These new requirements, moreover, are based on the Bureau's conjectures about application of LUC obligations to new and different types of entities never before addressed by the Commission. As "novel questions" unaddressed by previous FCC decisions, these matters should not have been addressed by the Media Bureau in the first instance.[9]

The Bureau's improper expansion of the LUC to innumerable additional party committees and PACs and countless political ads will profoundly impact broadcasters, a variety of political entities and actors, and even commercial advertisers competing for airtime against a proliferation of political ads. It also creates great uncertainty for both stations and ad buyers by unsettling other portions of the Act and FCC rules dealing with political advertising - including reasonable access, equal opportunities, and no censorship.[10] In sum, the Notice is an ill-timed and disruptive intervention into the 2026 political season.

## III. THE NOTICE'S DEFICIENT ANALYSIS OF THE ACT AND FECA FAILS TO JUSTIFY ITS VAST EXPANSION OF THE LUC

[8] *Id*. at 2.

[9] Under 47 C.F.R. § 0.283, "[m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents" must be "referred to the Commission en banc for disposition," rather than resolved by the Media Bureau pursuant to delegated authority.

[10] *See* 47 U.S.C. § 312(a)(7); 47 C.F.R. § 73.1944(a) (providing federal candidates "reasonable access" to, and the ability to purchase "reasonable amounts of time" for the use of, broadcast stations); 47 U.S.C. § 315(a) ("If any licensee shall permit . . . a legally qualified candidate . . . to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office . . . *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section."); 47 C.F.R. § 73.1941.

The Bureau's analysis of the "authorized" committee question under the Act and FECA consists only of two short paragraphs and a pretextual conclusion. In the first paragraph, the Notice states that, although Section 73.1942 of the rules does not reference a candidate's "authorized committee,"[11] Section 315(b) of the Act, "which section 73.1942 is intended to implement, repeatedly refers to candidates and their authorized committees as [supposedly] sharing the rights it confers."[12] Thus, the Notice claims that the FCC has "long held that the LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees."[13] The Bureau's abbreviated account here is incomplete and potentially misleading.[14]

The Notice then attempts to parse the dense language of FECA and its relation to Section 315 of the Act in three sentences. First, it notes that subsection 315(b)(2)(F) of the Act defines the term "authorized committee" by referring to FECA, which defines an authorized committee as "the principal campaign committee or any other political committee authorized and designated by a candidate to receive contributions or make expenditures on behalf of such candidate."[15] Next, while the Bureau recognizes that "FECA generally prohibits the designation as an authorized committee a political committee that supports more than one candidate," it cites an

---

[11] Notice at 1, citing 47 C.F.R. § 73.1942(a).

[12] *Id*., citing 47 U.S.C. § 315(b).

[13] *Id*., citing *In the Matter of Codification of the Commission's Political Programming Policies*, Memorandum Opinion and Order, 7 FCC Rcd 4611, 4614, para. 23 (1992) (1992 Political Programming Order).

[14] As described in Section II, in 1971 Congress passed FECA amending § 315(b) to adopt the LUC but making no mention of "authorized committees." *See* 47 U.S.C. § 315(b)(1). In 2002, Congress passed BCRA, which added the "stand by your ad" requirements in § 315(b)(2) – the only provision in § 315 to use the term "authorized committee." The clear differences between § 315(b)(1) and § (b)(2) – disguised by the Notice referring to "section 315(b)" generally – undercut any argument that § 315(b)(2)'s two parenthetical references to "authorized committee" in the "stand by your ad" provisions require that all committees created by parties or PACs with the authorized label somehow "share" the LUC rights granted to candidates under § 315(b)(1).

[15] Notice at 1, citing 47 U.S.C. § 315(b)(2)(F) and 52 U.S.C. § 30101(6).

exception allowing candidates to designate as an authorized committee a political committee "'established solely for the purpose of joint fundraising,'" as though that single exception proves the Bureau's entire argument and somehow justifies the Notice's broad expansion of the LUC rule, including to committees not dedicated to joint fundraising.[16] In the third sentence, the Bureau concludes by stating that the "FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under the FECA."[17] But Section 73.1942 of the rules does not refer to any committee(s) of any candidate – a fact the Notice recognized in the previous paragraph. This silence loudly undercuts the Notice's claims.

The Bureau's erroneous conclusion means that broadcasters must provide the LUC to any hybrid, joint, or other committee a political party or PAC can envision, so long as a certain label is attached. However, the Bureau ignores crucial elements of Section 315(b), FECA, and Section 73.1942 of the rules that preclude this boundless approach that the Notice derived from its insufficient statutory analysis. Petitioner submits that only a candidate's designated principal campaign committee is entitled to LUC rates, while other types of joint or hybrid committees are not. As set forth below, this approach is consistent with relevant federal laws and rules, as well as the view of the U.S. Department of Justice, as reflected in a recently filed brief with the U.S. Supreme Court.

The Bureau correctly states that the FCC has long held that the LUC provisions of Section 315(b) of the Act apply to both a legally qualified candidate and their authorized committee,[18] even though Congress adopted the LUC in the context of candidate ads without any

---

[16] *Id*. at 2, citing 52 U.S.C. §§ 30102(e)(3)(A) and (A)(ii).
[17] *Id*. at 2.
[18] Notice at 1, citing 1992 Political Programming Order, 7 FCC Rcd at 4614.

reference to any committees. In support, the Bureau cites the 1992 Political Programming Order, in which the FCC stated, "[W]e have always held that only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b)."[19] But the Notice notably omits the very next sentence in that 1992 order: "Thus, even if an independent entity produces an advertisement *that includes an appearance by a candidate*, that independent entity is *not* entitled to the LUC."[20] Accordingly, even the order on which the Bureau relies makes clear that it is not sufficient for a candidate to merely "authorize" a party, PAC, or other kind of hybrid or joint committee for those committees to obtain the LUC. The entity itself must be the "authorized committee" of a legally qualified candidate.[21]

As the Notice stated, Section 315(b)(2) of the Act defines "authorized committee" by referring to Section 30101 of FECA, which states that the term means the "principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate."[22] Section 30102(e)(1) provides that each candidate shall designate a committee to serve as their "principal campaign committee."[23] Therefore, this designated "principal campaign committee" is an "authorized committee" under both Section 30101 of FECA and Section 315(b)(2) of the Act, which refers to Section 30101.

Section 30102(e)(1) of FECA further provides that a candidate "may designate additional political committees . . . to serve as authorized committees of such candidate,"[24] but only if those

---

[19] 1992 Political Programming Order, 7 FCC Rcd at 4614.

[20] *Id*. (emphasis added).

[21] That same paragraph of the 1992 order also twice refers to a candidate or the candidate's "authorized committee," in the singular. *Id*. at 4613.

[22] 47 U.S.C. § 315(b)(2)(F); 52 U.S.C. § 30101(6).

[23] 52 U.S.C. § 30102(e)(1).

[24] *Id*.

committees exclusively support a single candidate, subject to two exceptions: (1) a Presidential candidate may designate the national committee of their political party as "a principal campaign committee," and (2) candidates "may designate a political committee established *solely for the purpose of joint fundraising* by such candidates as an authorized committee."[25] Thus, although such "joint fundraising committees" may be characterized as "authorized committees" under FEC rules, the plain language of FECA restricts their designation as an authorized committee exclusively to fundraising, not to other purposes such as campaigning or buying advertising, the latter of which is the only political activity implicating the LUC and associated FCC rules.

The U.S. Department of Justice agrees. A mere five months ago, well after the question of the LUC's applicability to hybrid and joint fundraising committees became a matter of public controversy, the Solicitor General adopted essentially the same view in a 2025 filing with the Supreme Court. Therein, the Solicitor General stated that the LUC rules "require broadcasters to charge low rates for candidate spending, but *not for party spending—whether coordinated or independent*,"[26] adding that, even if the federal limits on coordinated expenditures were removed, "[p]arties could spend more money on advertisements, but broadcasters still would not be required to charge parties special low rates."[27]

Under Sections 30101 and 30102 of FECA, therefore, only a candidate's designated principal campaign committee is entitled to the LUC, while joint fundraising committees, hybrid, and other kinds of committees are not "authorized committees" eligible for LUC rates under

---

[25] *Id*. at § 30102(e)(3)(A)(i)-(ii) (emphasis added).

[26] *Reply Brief for the Federal Respondents* at 23, *NRSC, et al., v. FEC, et al.*, No. 24-261, 2025 WL 3068193 (Oct. 1, 2025) (emphasis added). NRSC and others brought this case to challenge the constitutionality of federal government limits on coordinated expenditures between political parties and candidates, including spending on advertising. *NRSC, et. al. v. FEC, et. al.*, 117 F.4th 389 (6th Cir. 2024), *cert. granted,* 2025 WL 1787717 (U.S. Jun. 30, 2025) (No. 24-261).

[27] *Reply Brief for the Federal Respondents* at 23.

Section 315(b)(1) of the Communications Act or the FCC's rules. The Bureau's view is thus mistaken and must be corrected.[28]

Beyond its flawed analysis of FECA, the Bureau's reasoning also fails because it relies on an incomplete analysis of Section 315(b) of the Act and FCC rules. At the beginning of Section III, Petitioner explained that the Notice presents a brief, potentially misleading depiction of Section 315(b) and Section 73.1942, which, in addition to the errors identified above, also ignores highly pertinent LUC language in Section 315(b)(1). This language directly governs who is entitled to the LUC, making no references to committees, authorized or otherwise: "The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed" the LUC.[29] As set forth in Section II, Section 73.1942(a) of the FCC's rules is virtually identical to Section 315(b)(1) of the Act.

Adopted decades later in BCRA, Section 315(b)(2), on the other hand, sets forth the requirements for "stand by your ad messages" that must be met if an ad references a candidate's opponent. Despite the Notice's vaguely misleading statement that Section 73.1942 is "intended to implement" "section 315(b),"[30] the FCC's rule clearly only implements – by copying nearly word-for-word – Section 315(b)(1)'s obligation to provide the LUC to legally qualified candidates in connection with their campaigns. It is only Section 315(b)(2) that uses the term

---

[28] The Public Notice said nothing about state or local elections. Petitioner believes that, because the controlling definition of "authorized committee" in FECA is linked to federal election finance limitations, the exceptions in Section 30102(e)(1) of FECA seem limited to federal candidate committees. There is nothing else in FECA, the Communications Act, FCC rules, or elsewhere suggesting that these exceptions apply to state or local political parties, or other entities claiming to be "authorized" by a state or local candidate. Thus, even if such entities claimed to be "authorized" by a candidate under state or local law, they would not qualify for the LUC under federal law. The FCC should confirm this understanding of the relevant law.

[29] 47 U.S.C. § 315(b)(1).

[30] Notice at 1.

"authorized committee" and then only in the context of an ad's content. A straightforward reading of the statute thus makes clear that Section 315(b)(1) governs who is entitled to the LUC, while Section 315(b)(2) only governs what a federal candidate and an authorized committee of the candidate must do in order for that "candidate" – not any authorized committee – to receive the LUC (*i.e.*, include a properly formatted "stand by your ad" message in the ad).[31] A proper analysis of the structure and terms of Section 315(b) of the Act and Section 73.1942 of the rules accordingly do not support the Notice's claim that the statute and FCC rules mandate that the LUC be provided to any and all party, PAC, or other committees labeled "authorized." Such a reading unconvincingly mixes different statutory provisions adopted decades apart with very different purposes to arrive at an erroneous conclusion to which a reviewing court would not defer and would almost certainly reject.[32]

Moreover, the plain language of Section 315(b)(1) militates against the Notice's conclusions. Under that provision, only those uses of a station "in connection with" a specific candidate's campaign for election qualify for the LUC.[33] A legally qualified candidate for office, for example, is not entitled to the LUC for ads about the car dealership or insurance company she happens to own.[34] Accordingly, requests for ads that stations have received from allegedly "authorized committees" about ballot issues, candidates in other races, and issues unconnected to the candidate's specific campaign are nothing more than issue ads and are not entitled to the

---

[31] "In the case of a candidate for Federal office, such candidate shall not be entitled to receive" the LUC for use of a broadcast station unless the candidate certifies that the candidate (and any authorized committee of the candidate) shall not directly refer to another candidate for the same office, unless such reference meets the "stand by your ad" content and appearance requirements. 47 U.S.C. § 315(b)(2)(A) (emphasis added).

[32] *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

[33] "When interpreting a statute, we begin with the text," *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025), and "[i]n determining the scope of a statute" specifically, courts similarly "look first to its language." *United States v. Turkette*, 452 U.S. 576, 580 (1981).

[34] *See* FCC, *Political Primer*, 100 FCC 2d 1476, 1514 (1984).

LUC. A very brief, extraneous appearance by a candidate, often tacked onto the end of PAC or party ads, does not transform them into candidate ads "in connection with" the candidate's campaign, regardless of whether the committee is "authorized" by the candidate or the ads are paid for with coordinated funds, as stated in the Solicitor General's recent Supreme Court brief. For these reasons, the Bureau's position by default that all committees of all kinds are entitled to the LUC, so long as they are supposedly "authorized" by a candidate, is arbitrary and unsupported by facts or law.

## IV. THE NOTICE'S ANNOUNCEMENT OF NEW POLITICAL BROADCASTING REQUIREMENTS UNDER THE PRETENSE OF A "REMINDER" VIOLATES THE APA

The Bureau inaccurately characterizes the Public Notice as "guidance" intended to "remind" broadcasters about their requirements under the LUC rule and the Act, and to "restate previous Media Bureau guidance regarding LUC eligibility for candidate-party coordinated ads."[35] As observed in Section II, no such "previous" guidance is cited, and it appears nonexistent. In fact, the Notice appears to set forth new substantive LUC requirements that substantially broaden the scope of the FCC's existing rule and that have significant economic implications. And these new requirements, e.g., giving the LUC to party/candidate coordinated advertisements, are mandatory and enforceable, with broadcasters subject to complaints and FCC enforcement actions for claimed noncompliance.[36] In short, the new LUC requirements are rules subject to the APA's notice-and-comment provisions and should not have been announced as a *fait accompli* via a Bureau-level Public Notice.

---

[35] Public Notice at 1-2.

[36] *See id*. at 2 (declaring that "candidate-party coordinated advertisements are subject to the LUC provisions").

Under the APA, promulgation of a rule generally requires notice published in the Federal Register and an opportunity for interested persons to comment.[37] "A rule is defined very broadly"[38] to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy,"[39] which clearly describes the Notice's substantive LUC requirements. Where, as here, a rule has the "force and effect of law" or "alter[s] the rights or interests of parties," it is "subject to the APA's notice-and-comment provisions."[40] The Notice altered the rights and interests of broadcasters and non-authorized committees, but without notice or public comment. Accordingly, these new legal requirements are procedurally defective and cannot be enforced.

The FCC, moreover, cannot "escape" notice-and-comment requirements by labeling the Notice's "substantive legal addition to [the LUC] rule a mere interpretation."[41] The U.S. Court of Appeals for the D.C. Circuit, for example, rejected an agency's claim that its "Guidance" – as the Bureau's Public Notice is labeled – only interpreted an existing rule, when that "Guidance" had "significantly broadened" that rule, which the agency could not legally do without complying with the requisite rulemaking procedures.[42] In another case, the court found that an agency erred by not adhering to the APA's rulemaking requirements when it announced legally binding findings via a press release on its website.[43] The Bureau here similarly erred by releasing on the FCC's website a Public Notice that "expanded the scope" of the legally binding requirements

---

[37] 5 U.S.C. §§ 553(b) & (c).

[38] *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (internal citation omitted).

[39] 5 U.S.C. § 551(4).

[40] *City of Billings v. Transportation Sec. Admin*., 153 F.4th 46, 51-52 (D.C. Cir. 2025).

[41] *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000). *See* 5 U.S.C. § 553(b) (stating that the APA's rulemaking requirements do not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice").

[42] *Appalachian Power*, 208 F.3d at 1028 (concluding that the "more expansive reading" of the EPA's rule, unveiled in a document labeled as agency "Guidance," could not stand).

[43] *Safari Club*, 878 F.3d at 323.

under the LUC rule without notice and comment[44] or publication in the Federal Register.[45] Nor can the FCC avoid APA procedures by claiming that its Public Notice was only a "clarification" of the LUC rule because the Notice "effects a substantive change" in that preexisting rule.[46]

By adopting this Notice without providing interested parties any opportunity to comment, the FCC furthermore has created inconsistencies and uncertainties as to how these "authorized" ads are supposed to be treated under other FCC rules. For instance, are these "authorized" committee ads entitled to "reasonable access" to broadcast stations, even though reasonable access is governed by a wholly different section of the Act, Section 312?[47] If this Notice is intended to provide reasonable access for these "authorized ads," the resulting burden on broadcasters from having to sell advertising to new classes of political advertisers at artificially low rates dramatically increases. The increased demand also may limit the ability of broadcasters in states with multiple contested federal races to sell advertising to a station's valued commercial advertisers, or to state and local political candidates who have no reasonable access rights.

Application of the revised LUC rules may well rise to the level of an unconstitutional regulatory taking. That inquiry turns on "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed

---

[44] *Appalachian Power*, 208 F.3d at 1024; *see also Safari Club*, 878 F.3d at 332-33 (rejecting the label of "informal adjudication" that the agency had tried to attach to its action and concluding that the agency's findings reflected a rule and thus compliance with the APA was required).

[45] "All 'interpretations of generally applicability' and 'statements of general policy' must be published in the Federal Register," even for those policy statements and interpretations that do not require compliance with notice-and-comment rulemaking procedures. *Exelon Gen. Co., LLC v. Local 15, IBEW*, 676 F.3d 566, 577 (7th Cir. 2012), quoting 5 U.S.C. § 552(a)(1)(D).

[46] *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34-5, 38 (D.C. Cir. 2005) (rejecting FCC's claim that it merely had provided "clarifications" of an existing rule, and concluding that the FCC's substantive changes to its preexisting rule "can be valid only if it satisfies the notice-and-comment requirements of the APA").

[47] 47 U.S.C. § 312(a)(7).

expectations; and (3) the character of the governmental action."[48] Forcing broadcasters to surrender their valuable airtime to anyone "authorized" by a candidate directly interferes with broadcasters' business model and forces them to bear costs that should be borne by others. The government cannot do so without providing just compensation. U.S. Const., amend. V, cl. 4.

A station's position under the "no censorship" policy of Section 315(a) of the Act may be even more precarious. Under that provision, a broadcaster cannot censor the message of a candidate and, by Supreme Court precedent,[49] it cannot be held liable for any content contained in that ad, including defamatory statements. As the Notice does not address the no censorship provision, stations are left in an untenable position when faced with a claim that an "authorized" ad is defamatory. The station either assumes that the ad is treated like a candidate ad and not censor its message (and risk liability should a court determine that, because Section 315(a) does not mention "authorized" ads, the broadcaster can in fact censor such ads) or the broadcaster can reject the ad to avoid civil liability and face penalties should the FCC determine that these "authorized" ads are treated like candidate ads for all purposes.

The silence of the Notice on these significant matters is deafening – and would likely not exist if the Commission had gone through its normal process for considering important policy changes. The FCC cannot adopt such changes in the manner it did and leave those subject to the regulations at the mercy of the uncertain implications of its actions. "'[R]ules is rules,' no matter their gloss."[50] And the Public Notice assuredly announced "rules" – new requirements that

---

[48] *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017) (citations omitted).

[49] *Farmers Educ. & Coop., Union of America, North Dakota Div. v. WDAY*, 360 U.S. 525, 535 (1959).

[50] *Safari Club*, 878 F.3d at 332, quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1284-85 (D.C. Cir. 2005).

substantially broadened the FCC's existing LUC rule. Accordingly, the FCC should repeal the Notice as contrary to the APA.

## V. THE LUC PROVISIONS ARE CONTRARY TO THE FIRST AMENDMENT AND THE NOTICE'S SUBSTANTIAL EXPANSION OF THEM EXACERBATES THEIR UNCONSTITUTIONALITY

The Media Bureau's expansion of its LUC rule to seemingly unlimited third parties further highlights why its LUC rule in 47 C.F.R. § 73.1942 and the underlying statutory provisions in 47 U.S.C. § 315(b)(1) violate the First Amendment. The FCC should not continue to enforce its unconstitutional LUC rule and should abrogate the Notice's new, additional LUC requirements that exacerbate the rule's unconstitutionality.

### A. The LUC Provisions Cannot Withstand First Amendment Scrutiny

The pre-existing LUC rule, the new LUC requirements, and the underlying statute are, on their face, content-based and speaker-based restrictions subject to strict First Amendment scrutiny, under which the government must prove that they further a compelling interest and are narrowly tailored.[51] Neither the Bureau nor the Commission can make those showings.

The existing and expanded LUC requirements and Section 315(b)(1) are textbook content- and speaker-based regulations. They apply to (i) specific content, i.e., speech "in connection with" a legally qualified candidate's campaign for nomination/election for public office and now ads that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office; and (ii) specific persons or entities, i.e., "legally qualified candidates" and their "authorized committees," now including an expanded range of joint and hybrid political committees and PACs. The rules and statute are "content based on [their] face," and "subject to strict scrutiny regardless of the government's benign motive [or] content neutral

[51] *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 170-171 (2015).

justification."[52] Even apart from the content- and viewpoint-based nature of the rules and statute, these provisions impermissibly intrude on broadcasters' own speech and programming decisions.

The Notice cited zero grounds for the FCC's existing or additional regulation of political speech, and the LUC rules and their underlying statutory requirements accordingly fail strict (or other) First Amendment scrutiny. That omission is especially glaring given that the "First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'"[53] The Supreme Court has recognized "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance," and has consistently rejected other governmental aims, "[h]owever well intentioned," including "reduc[ing] the amount of money in politics" or "level[ing] electoral opportunities by equalizing candidate resources."[54] Thus, the Court has already rejected as insufficient bases for justifying political speech regulation interests very similar to those that the LUC statutory provisions and rules were intended to promote.[55] The FCC's discriminatory regulatory regime does nothing to prevent "quid pro quo" corruption or to further any other legitimate governmental interest.

---

[52] *Reed*, 576 U.S. at 165.

[53] *FEC v. Cruz*, 596 U.S. 289, 302 (2022) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

[54] *Id*. at 305, citing *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) and *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749-50 (2011).

[55] Congress passed FECA, which amended Section 315(b) of the Act to include a new LUC provision, as a "comprehensive approach to the problem of political campaign reform and excessively high campaign costs." S. Rep. No. 96, 92d Cong., 1st Sess. 33 (1971). FECA's provisions limited campaign contributions and imposed spending limits on federal candidates/campaigns, while trying to lower campaign costs through provisions such as the LUC. The Supreme Court quickly found many of FECA's provisions, including the campaign spending limits, unconstitutional. *See Buckley v. Valeo*, 424 U.S. 1 (1976); *Citizens United v. FEC*, 558 U.S. 310 (2010); *McCutcheon v. FEC*; *NRSC v. FEC* (pending). Given that candidates are not subject to spending limits, the government's interest in and rationale for maintaining the related content- and speaker-based speech regulations in Section 315(b)(1) has disappeared. Candidates, moreover, do not lack access to a wide range of media outlets today, many of which did not exist in 1971 when FECA was enacted, and they can now reach the public directly without the intermediation of the traditional media at all.

The FCC's regime also effectively compels broadcasters to subsidize certain government-favored speakers and speech via the LUC.[56] "Just as the First Amendment may prevent the government from prohibiting speech," it "may prevent the government from compelling individuals . . . to pay subsidies for speech to which they object."[57] Broadcasters' editorial right to choose programming is protected speech,[58] and the proliferation of "authorized" committee ads and coordinated party/candidate ads would substantially increase the amount of programming content over which broadcasters are deprived of their right to choose or even to decline to subsidize.[59]

The FCC at the least must reverse the recent significant expansion of its discriminatory LUC regulatory regime. Rather than addressing (or even acknowledging) the First Amendment problems inherent in its regime, the Bureau only exacerbated its unconstitutionality by announcing new content- and speaker-based regulations of speech. The FCC's existing LUC rule is unconstitutional on its face. But, at a minimum, its substantial expansion to all manner of committees and political party expenditures violates the First Amendment. The FCC should

[56] "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all," *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (citation omitted), and extends "not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515 U.S. 557, 573 (1995).

[57] *U.S. v. United Foods*, 533 U.S. 405, 410 (2001). "Any regulation that compels the funding of advertising must be subjected to the most stringent First Amendment scrutiny." (Thomas, J., concurring). *Id*. at 419.

[58] When a "broadcaster exercises editorial discretion in the selection and presentation of programming, it engages in speech activity." *Ark. Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

[59] *See* 47 U.S.C. § 315(a); 47 C.F.R. § 73.1941(a) (providing that licensees "shall have no power of censorship over the material broadcast" by legally qualified candidates using a broadcast station).

comport with the basic tenet – "which has for so long been applied by th[e] [Supreme] Court that it is beyond debate" – that statutes should be construed to avoid constitutional questions."[60]

In addition to the First Amendment failings identified above, the expansion of the LUC regime cannot even meet the threshold question – under any constitutional standard – of whether the government has established that it is preventing an actual harm by its speech regulation. When defending a speech restriction, the government "must do more than simply posit the existence of the disease sought to be cured. It must instead point to record evidence or legislative findings demonstrating the need to address a special problem."[61] The courts have "never accepted mere conjecture as adequate to carry a First Amendment burden."[62] The Bureau did not and cannot point to a single instance in the (nonexistent) record showing that expanding the discriminatory LUC regime is needed to prevent some (unidentified) harm. And because there is no actual, identified problem to be solved, there is by definition no compelling (or even substantial) governmental interest justifying the newly expanded LUC requirements. Relatedly, the FCC also cannot show that its new LUC requirements are narrowly tailored.[63] Given that the expansive LUC rules now apply to any committees that might be labeled as "authorized" and to a potentially vast range of coordinated party/candidate ads, they likely will impact "substantially more speech than is necessary" to further any interest the FCC might assert.[64] At the very least,

---

[60] *Jones v. U.S.*, 526 U.S. 227, 239-40 (1999).

[61] *FEC v. Cruz*, 596 U.S. at 307 (internal quotation marks and citations omitted).

[62] *Id.* (internal quotation marks and citations omitted).

[63] Strict scrutiny requires the FCC to "advance the State's compelling interest through the least restrictive means," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015), and even under intermediate scrutiny, a speech regulation must be shown to alleviate a real harm "in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).

[64] *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). Given the discriminatory treatment favoring certain ads of candidates/committees/parties under the Notice, these ads could rapidly proliferate to fill stations' advertising airtime to the detriment (or even exclusion) of other political and commercial advertisers. The FCC has no basis for exacerbating the harms that other speakers will suffer under its amended LUC regime.

then, the FCC must abrogate the Notice and confirm that the LUC rule only applies to ads paid for by a legally qualified candidate or its designated principal campaign committee.

### B. Broadcasting Is Entitled To Full First Amendment Protections

The FCC's LUC rule and the underlying statutory provision violate the First Amendment under any plausible standard. But to the extent the Notice assumes that broadcasters only enjoy reduced First Amendment protections based on the alleged "scarcity" of spectrum cited in *Red Lion* and its progeny,[65] this position should be rejected.

The theory of scarcity has been well and truly debunked. When determining in 1987 to no longer enforce the fairness doctrine as contrary to the First Amendment, the Commission found that "there is no longer a scarcity in the number of broadcast outlets" available to the public.[66] More significantly, the Commission concluded that the "concept of scarcity – be it spectrum or numerical – is irrelevant" to determining the appropriate First Amendment standard to apply to broadcasting and that the scarcity rationale developed in *Red Lion* and successive cases "no longer justifies a different standard of First Amendment review for the electronic press."[67]

Beyond the Commission, the scarcity rationale has been found to be no longer applicable, economically and scientifically incorrect, and inappropriate for grounding a constitutional rule that affords broadcasting lesser First Amendment protection. When enacting the 1996 Telecommunications Act, Congress found that the "scarcity rationale for government regulation [of broadcasting] no longer applies."[68] Circuit court of appeal judges have pointed

---

[65] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) (upholding the fairness doctrine as lawful and applying a different First Amendment standard to broadcasting because spectrum was a scarce resource).

[66] *In re Syracuse Peace Council against Television Station WTVH Syracuse, NY*, 2 FCC Rcd 5043, 5054 (1987), *aff'd, Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989).

[67] *Id*. at 5052, 5055.

[68] H.R. Rep. No. 104-204, at 54 (1995) (citing "significant changes" in audio and video marketplace).

out that "[a]ll economic goods are scarce," and as a "universal fact," scarcity "can hardly explain regulation in one context" (i.e., broadcasting) and "not another" (i.e., print).[69] Judges have noted the "absurdity of this bifurcated approach" to content-based regulation of the media,[70] which permits regulation of broadcasting that would be "intolerable" if applied to other media.[71] Unsurprisingly, the Supreme Court acknowledged criticism of the scarcity rationale as early as the mid-1980s.[72]

The Court has since declined to extend the lesser standard of First Amendment protection applied to broadcasters to any other electronic media, including telephone dial-in services, cable TV, and the internet.[73] Notably, Supreme Court Justices and circuit court judges across the

---

[69] *Telecomm. Res. & Action Center (TRAC) v. FCC*, 801 F.2d 501, 508 (D.C. Cir. 1986). Decades ago, the D.C. Circuit specifically noted the "persuasive evidence that the scarcity rationale is no longer tenable." *Tribune Co. v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998). In addition to erring as an economic matter, *Red Lion* seemed to "assume[] that there is a tangible thing, radio spectrum, of which there is a scarce amount" – an assumption that is "simply incorrect as a matter of scientific fact." FCC Media Bur. Staff Research Paper, J.W. Beresford, *The Scarcity Rationale for Regulating Traditional Broadcasting: An Idea Whose Time Has Passed*, at 9 (Mar. 2005). Digital technology and other advances, moreover, have made spectrum use much more efficient and greatly expanded outlets for speech. *See, e.g*., J. Soriano, *The Digital Transition and the First Amendment: Is It Time to Reevaluate Red Lion's Scarcity Rationale*, 15 B.U. Pub. Int. L.J. 341, 344 (2006).

[70] *Action for Children's Tel. (ACT) v. FCC*, 58 F.3d 654, 673 (D.C. Cir. 1995) (en banc) (Edwards, J., dissenting).

[71] *TRAC,* 801 F.2d at 508; *accord FCC v. League of Women Voters*, 468 U.S. 364, 376 1984); *ACT*, 58 F.3d at 672 (Edwards, J., dissenting).

[72] *League of Women Voters*, 468 U.S. at 376 n.11 (noting that the rationale of spectrum scarcity "has come under increasing criticism in recent years," with "[c]ritics, including the incumbent Chairman of the FCC," calling it "obsolete").

[73] *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127-28 (1989); *Turner,* 512 U.S. at 637; *Reno v. ACLU*, 521 U.S. 844, 867-68 (1997). Beyond the alleged scarcity of spectrum, broadcasting's presence in the home and accessibility to children was relied upon in *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978), to apply a reduced level of First Amendment protection to broadcasting in the context of the FCC's indecency rules. But technologies like cable TV, satellite TV/radio, the internet, and streaming mean that "traditional broadcast television and radio are no longer the 'uniquely pervasive' media forms they once were." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 532 (2009) (*Fox TV I*) (Thomas, J., concurring).

political spectrum have found *Red Lion* and *Pacifica* woefully outdated, unmoored from the Court's First Amendment jurisprudence, and leading to "doctrinal incoherence."[74]

Simply put, a constitutional rule denying broadcasters their full First Amendment rights – and lesser rights than afforded to all other media – has no grounding in the Constitution. The First Amendment clearly states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." The Amendment contains nary a hint that the freedoms under it can vary depending upon the type of speech or press involved or that these freedoms can, in fact, be abridged when applied to certain types of speakers or media outlets but not to others. The Supreme Court already has recognized that it "must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker."[75] The reduced First Amendment protections broadcasters receive under *Red Lion* and *Pacifica* are an anachronism that should be repudiated.[76]

Even under the outmoded standards of *Red Lion* and *Pacifica*, however, the LUC provisions in general—and the Public Notice in particular—are unconstitutional. Those standards still require regulations to be "narrowly tailored to further a substantial governmental interest."[77] As explained above, the plethora of other communication avenues available to political

---

[74] *Fox TV I*, 556 U.S. at 532-33 (Thomas, J., concurring); a*ccord FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 259 (2012) (Ginsburg, J., concurring); *TRAC*, 801 F.2d at 508 (Bork, J., writing for the court); *ACT*, 58 F.3d at 672-73 (Edwards, J., dissenting); *Arkansas AFL-CIO v. FCC*, 11 F.3d 1430, 1443 (8th Cir. 1993) (en banc) (Arnold, J., concurring); *Time Warner Entm't Co. v. FCC*, 105 F.3d 723, 724 n.2 (D.C. Cir. 1997) (Williams, J., dissenting from denial of rehearing en banc).

[75] *Citizens United*, 558 U.S. at 326 (stating that "[s]ubstantial questions would arise" if courts said "what means of speech should be preferred or disfavored," and "in all events, those differentiations might soon prove to be irrelevant or outdated by technologies . . . in rapid flux").

[76] The constitutional protections afforded to broadcasting under the First Amendment cannot turn on "transitory facts" (e.g., scarcity of radio frequencies) but must have a "textual basis in the Constitution." *Fox TV I*, 556 U.S. at 532 (Thomas, J., concurring).

[77] *League of Women Voters*, 468 U.S. at 380.

candidates and parties today obviates the need for government-mandated discounts on their ads, and there is certainly no tailored justification for requiring those discounts only in the broadcasting context. The Public Notice only compounds those problems by unlawfully extending LUC rates to even more political entities. Neither the statutory LUC provisions nor those unwarranted extensions can be squared with the First Amendment.

## VI. FAILURE TO TAKE PROMPT ACTION ON THIS PETITION WILL NECESSITATE JUDICIAL REVIEW OF THE FCC'S MAJOR EXPANSION OF THE LUC REQUIREMENTS

Petitioner respectfully requests prompt action on this petition. As discussed, the Bureau's Public Notice dramatically expands the FCC's longstanding position on the applicability of the LUC requirement. The Notice thus already has created uncertainty for broadcasters and other TVB members and raises significant economic and programming questions that impact their planning and chill protected speech, causing First Amendment harms.[78] These harms will be greatly exacerbated if the Supreme Court overturns its existing precedent and holds that limits on coordinated expenditures between political parties and candidates are unconstitutional in *NRSC, et al., v. FEC, et al.*, No. 24-261. Moreover, because the Public Notice is written as if the FCC has long held the position stated in that Notice—and, indeed, is framed as a "remind[er]" about existing requirements—the FCC's failure to take prompt action to repudiate this position alone will confirm that the FCC has already adopted this position, thus requiring judicial review. The FCC therefore should act on this petition before the Supreme Court rules in *NRSC* and advertisers flood Petitioner's members with unlawful claims for LUC rates based on the erroneous Public Notice.

[78] *See Susan B. Anthony List*, 573 U.S. at 155, 164.

## VII. CONCLUSION

For all these reasons, the FCC should grant this petition for reconsideration or, in the alternative, for declaratory ruling, and promptly repudiate and repeal the Public Notice's unlawful and unwarranted expansion of the LUC requirements. The FCC also should determine to no longer enforce its LUC rules in their entirety.

Respectfully submitted,

_________________________________

Brad Seitter
President & Chief Executive Officer
**Television Bureau of Advertising, Inc.**

120 Wall Street
15th Floor
New York NY 10005
(212) 486-1111

April 29, 2026

# Attachment 2

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>*Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees* | Docket No. ________<br><br>DA 26-300 |

**APPLICATION FOR REVIEW**


David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

*Counsel for Applicants*


April 29, 2026

**TABLE OF CONTENTS**

Summary ........ iii

Application for Review ........ 1

Question Presented ........ 1

Background ........ 2

I. Statutory and regulatory framework ........ 2

A. The "lowest unit charge" entitlement ........ 2

B. The Media Bureau's LUC Guidance ........ 5

C. The Applicants ........ 6

Argument ........ 9

I. The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees ........ 9

A. Party committees' coordinated expenditures are not use by a candidate. ........ 10

B. Advertisements by JFCs with non-candidate members are not "use" by a candidate. ........ 13

C. Applicants are aggrieved by the Media Bureau's LUC Guidance. ........ 17

Conclusion ........ 19

## SUMMARY

In 1971, to address candidates' ballooning campaign costs, Congress required broadcast stations to provide special low rates—known as "lowest unit charge"—to candidates in the run-up to elections. The plain text of the resulting statute, codified at Section 315(b) of the Communications Act, reflects this limited purpose—it entitles only "candidates" to the special rates. 47 U.S.C. § 315(b)(1). But the Media Bureau recently issued guidance purporting to require broadcast stations to offer lowest unit charge to advertising purchased by two categories of non-candidate political committees: (1) party committees engaged in coordinated expenditures and (2) "Joint Fundraising Committees" (JFCs) with candidate and non-candidate committee members. That guidance directly conflicts with the plain text of the Communications Act and the Commission should set it aside, making clear that only candidates and candidate committees are entitled to lowest unit charge.

Advertisements by party committees are not entitled to lowest unit charge because they are not "use" of a broadcasting station "by . . . a legally qualified candidate," *id.*, even if they are "coordinated" with a candidate. The Federal Election Campaign Act (FECA) distinguishes between (1) party committee *contributions* to candidate committees for the candidate's own use, *see* 52 U.S.C. § 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *see id.* § 30116(d). The latter are "use" by a party committee, not by a candidate, because they are required to be the party committee's expenditures—if they were the candidate's use, they would be unlawful contributions to the candidate's committee.

Advertisements by JFCs with candidate and non-candidate members are also not entitled to lowest unit charge because, by law, much of the cost of those advertisements is borne by non-candidate members who are not entitled to lowest unit charge. *See* 11 C.F.R. § 102.17(c)(7). The

Media Bureau justified its guidance by noting that JFCs can be formally designated as "authorized committees" of candidates under FECA. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 U.S.C. § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends *the candidate's* share of fundraising expenses and receives *the candidate's* share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). It does not justify treating JFC expenditures as candidate expenditures entitled to lowest unit charge, even though some, and often nearly all, of those expenditures are paid for by non-candidate committees with no right to lowest unit charge.

Expedited action by the Commission is essential. The Bureau's unlawful guidance will imminently harm candidates in competitive House and Senate races in the 2026 cycle, including Applicants Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald Rivet, and their respective campaign committees. By forcing broadcasters to charge lower rates to non-candidate committees that—unlike Applicants—are not entitled to them, the Bureau's guidance ensures that Applicants will "face intensified competition" for limited airtime in violation of the Communications Act. *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (emphasis omitted). They will also be subject to—and forced to respond to—a greater volume of negative advertisements purchased at lower rates. And because the Bureau's guidance allows non-candidates to buy more advertisements at lower rates, Applicants will be hampered in their ability to control their own independent campaign messages and policy positions, which risk being drowned out by political party messaging—from the Republican and Democratic Parties alike. As candidates for public office, Applicants have "an interest in a fair process" untainted by unlawful ad spending. *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 (2026). The Commission should

set aside the Bureau's erroneous guidance and vindicate Congress's "effort to reduce candidates' escalating campaign costs" without extending those same benefits to other groups. *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54 (1991).

## APPLICATION FOR REVIEW

Applicants Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald Rivet, along with their principal campaign committees,[1] respectfully request that the Commission set aside the FCC Media Bureau's March 30, 2026, Public Notice providing Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees, DA 26-300 ("LUC Guidance"). The LUC Guidance merits the Commission's review because it is in direct conflict with the Communications Act of 1934. *See* 47 CFR § 1.115(b)(2)(i). The LUC Guidance is attached to this Application as Exhibit A.

Applicants bring this challenge as an Application for Review pursuant to the D.C. Circuit's decision in *National Ass'n of Broadcasters v. FCC*, No. 14-1072, 2014 WL 4449657 (D.C. Cir. Sep. 9, 2024) (unpublished), which held that a challenge to a similar guidance document may—and must—be initiated via this procedure.

## QUESTION PRESENTED

Whether the Media Bureau's March 30, 2026, Public Notice, DA 26-300, requiring broadcasters to provide the lowest unit charge for (1) political party committees' advertisements that qualify as coordinated expenditures under FECA, and (2) joint fundraising committees' advertisements, must be set aside as contrary to Section 315(b)(1) of the Communications Act of 1934?

[1] Friends of Sherrod Brown, Jon Ossoff for Senate, Cooper for North Carolina, and Kristen for Michigan.

## BACKGROUND

### I. Statutory and regulatory framework

#### A. The "lowest unit charge" entitlement

Section 315(b)(1) of the Communications Act of 1934 entitles "legally qualified candidate[s] for any public office" who "use . . . any broadcasting station" shortly before their elections to do so at "the lowest unit charge of the station for the same class and amount of time for the same period." 47 U.S.C. § 315(b)(1). This valuable entitlement takes effect 45 days before the candidate's primary election or runoff and 60 days before the candidate's general election. *Id.* § 315(b)(1)(A). It was enacted in its present form as part of the Federal Election Campaign Act of 1971 (FECA), which comprehensively regulates the finances of federal campaigns. *See Hernstadt v. FCC*, 677 F.2d 893, 897 (D.C. Cir. 1980).

FECA requires all federal candidates to designate a "principal campaign committee" to accept contributions and make expenditures on their behalf. 52 U.S.C. § 30102(e)(1). Everyone agrees that stations must offer lowest unit charge for advertisements purchased by those principal campaign committees on behalf of the "legally qualified candidate" they support. This Application concerns whether stations must *also* offer lowest unit charge to advertisements purchased by two other categories of committees that are further removed from the candidates themselves: party committees engaged in coordinated expenditures under 52 U.S.C. § 30116(d), and joint fundraising committees established by candidates and non-candidates "solely for the purpose of joint fundraising by such candidates," *id.* § 30102(e)(3)(A)(ii). While the dispute is ultimately over the meaning of the Communications Act, understanding it requires an explanation of federal campaign finance law's treatment of those two categories of committees.

**Party Committee Coordinated Expenditures.** FECA sharply limits the size of "contributions" that may be made to federal political committees, including candidate committees.

*See* 52 U.S.C. § 30116(a). To prevent donors from evading those limits by directly paying vendors on a candidate's behalf, FECA also treats as contributions, subject to those same limits, expenditures that are "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." *Id.* § 30116(a)(7)(B)(i); *see Shays v. FEC*, 414 F.3d 76, 97 (D.C. Cir. 2005). But FECA contains an important exception to that treatment, which Congress enacted with its 1974 FECA amendments: State and national political party committees may make substantial coordinated expenditures in connection with federal candidates' campaigns without those expenditures being treated as contributions. *See* 52 U.S.C. § 30116(d). In the 2026 cycle, eligible party committees may coordinate with candidates with respect to up to $130,600 of expenditures for most House contests and between $130,600 and $4 million in Senate contests.[2] The Supreme Court is currently weighing whether the First Amendment prohibits restricting at all the amount that parties may spend on coordinated expenditures. *See generally NRSC v. FEC*, No. 24-621 (U.S.). But whether party coordinated expenditures remain limited or become unlimited, they must still be *the party's* expenditures rather than the candidate's—that is, the party must be the one paying the bills—because the parties' direct monetary contributions to candidate committees are subject to much lower limits that are not being challenged in the pending Supreme Court case. *See* 52 U.S.C. § 30116(a)(1)(A), (h); Tr. of Oral Argument at 82:15-83:8, *NRSC*, No. 24-621.[3]

**Joint Fundraising Committees.** In addition to establishing a principal campaign committee, FECA allows federal candidates to "designate a political committee established solely

[2] *See Coordinated Party Expenditure Limits*, FEC, https://www.fec.gov/help-candidates-and-committees/making-disbursements-political-party/coordinated-party-expenditures/coordinated-party-expenditure-limits/ (last visited Apr. 28, 2026).

[3] Oral Arg. Transcript, *NRSC v. FEC*, No. 24-261 (U.S. Dec. 9, 2025), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-621_q86b.pdf.

for the purpose of joint fundraising by such candidates as an [additional] authorized committee." 52 U.S.C. § 30102(e)(3)(A)(ii); 11 C.F.R. § 102.17(a)(1), (2). Such committees are commonly known as "joint fundraising committees" or "JFCs." To form a JFC, the participating committees must establish a separate committee (or designate one of the participating committees) to serve as the joint fundraising representative and enter into an agreement that "state[s] a formula for the allocation of fundraising proceeds." 11 C.F.R. § 102.17(c)(1). A JFC's only permissible purpose is to "collect contributions, pay fundraising costs from gross proceeds and from funds advanced by participants, and disburse net proceeds to each participant." *Id.* § 102.17(b)(1); *see* 52 U.S.C. § 30102(e)(3)(A)(ii). In doing so, the FEC's joint fundraising regulation requires JFC participants to split expenses for each fundraising effort in proportion to their split of proceeds from that effort. 11 C.F.R. § 102.17(c)(7). In recent years, candidates have formed JFCs with party committees, which have higher contribution limits than candidates; with national party committees' even-higher-limit specialty account; and with other non-candidate committees, which also have higher contribution limits than candidates. An overwhelming majority of proceeds of these JFCs flow to the non-candidate committees, due to their higher contribution limits, which therefore bear the overwhelming majority of expenses as well.[4]

Beginning in the 2024 election cycle, select JFCs began running advertisements that were nearly indistinguishable from ordinary campaign ads. These advertisements advocated expressly for a specific Republican Senatorial candidate and against their Democratic opponent. Some

[4] *See, e.g.*, *Nevada Victory Committee*, FEC, https://www.fec.gov/data/committee/C00890962/ (last visited Apr. 28, 2026); *Wisconsin Victory Committee*, FEC, https://www.fec.gov/data/committee/C00889493/ (last visited Apr. 28, 2026).

advertisements were narrated by a Republican candidate, touting the candidates' background.[5] Others attacked Democratic opponents as corrupt or radical.[6] The only feature that distinguishes these ads from typical candidate or party-coordinated ads is a brief fundraising pitch—a call to "join" the candidate's "team"—in the final few seconds, along with an on-screen QR-code that prompts donations to the JFC.

### B. The Media Bureau's LUC Guidance

Until recently, the FCC had not provided direct guidance on whether party coordinated expenditures and JFC expenditures are entitled to lowest unit charge for their use of broadcasting stations shortly before elections. And in connection with the litigation over the constitutionality of the party coordinated expenditure limits in *NRSC v. FEC*, the Solicitor General argued in his reply brief that the Communications Act "require[s] broadcasters to charge low rates for candidate spending, *but not for party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC v. FEC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added).

After this announcement, the National Association of Broadcasters released a new guidance memo to its broadcaster members. *See* Ex. B ("NAB Memo"). NAB stated its "belie[f]" that "a candidate's designated principal campaign committee is entitled to lowest unit charge, while 'joint fundraising committees' and other 'hybrid' committees are not."

On March 30, 2026, just days after the NAB Memo was issued, the Media Bureau issued the LUC Guidance. The LUC Guidance states the Bureau's position that "the LUC requirements

[5] *More Work to Do*, MI Victory Committee/Rogers, https://perma.cc/GY65-XBX6 (last visited Apr. 29, 2026); *Call to Duty*, Sheehy Victory Committee, https://perma.cc/9S62-6XMR (last visited (Apr. 29, 2026).

[6] *See, e.g.*, *Conflict of Interest*, WI Victory JFC/Hovde, https://perma.cc/8KUC-ZX7Z (last visited Apr. 29, 2026); *Radical Too*, Fischer Victory Fund, https://perma.cc/AV7G-FBPX (last visited Apr. 29, 2026).

are applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office." Ex. A ("LUC Guidance") at 1. It states that "the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees" because the Act "repeatedly refers to candidates and their authorized committees as sharing the rights it confers." *Id.* It asserts that "[t]he FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under FECA." *Id.* at 2. And it further purports to "restate previous Media Bureau guidance" (which it neither cites nor otherwise identifies) that "candidate-party coordinated advertisements are subject to the LUC provisions, provided that the ad otherwise complies with other applicable requirements." *Id.*

### C. The Applicants

Applicants are legally qualified Democratic candidates for the U.S. House of Representatives and U.S. Senate in the upcoming 2026 election, along with their principal campaign committees. Each is running in a highly competitive race that has been targeted by the Republican Party for likely coordinated party expenditures in support of Applicants' opponents.

Applicant Sherrod Brown served three terms as United States Senator from the state of Ohio, from 2007 until 2025. In 2024, Senator Brown lost his seat by less than 4% in a hotly contested race to now Senator Bernie Moreno. He is now challenging sitting Senator Jon Husted in the 2026 election, whom Ohio Governor Mark DeWine appointed to fill the seat vacated by Vice President J.D. Vance. The NRSC has characterized the Ohio Senate seat as one of only three

"true defensive targets."[7] Senator Brown therefore expects the race will draw significant spending by NRSC, including in party-candidate coordinated advertisements. In 2024, the NRSC spent more than $1.9 million on media in coordination with Senator Bernie Moreno's campaign to unseat Senator Brown,[8] and nearly $90k more in independent expenditures.[9]

Applicant Jon Ossoff is a United States Senator for the State of Georgia. Senator Ossoff won his seat in 2020 in an exceedingly close and nationally watched race. On election night, no candidate received more than 50% of the vote, forcing the race to a runoff between Senator Ossoff and then-incumbent Senator David Perdue. In the runoff election on January 5, 2021, Senator Ossoff prevailed by only 1.2%. The Republican Party has publicly touted Senator Ossoff's seat "as their top pickup opportunity in the Senate,"[10] and reporters have suggested that the race "may become the most expensive Senate race ever."[11] Indeed, the 2020 race for Senator Ossoff's seat currently holds the record for most expensive Senate race in history,[12] with the NRSC spending $1.3 million in coordinated expenditures with then-Senator Perdue's campaign,[13] and another $14

---

[7] Max Greenwood, *NRSC Chair Tim Scott Predicts Record-Breaking Spending in 2026 Senate Race*, Campaigns & Elections (Feb. 10, 2025), https://campaignsandelections.com/industry-news/nrsc-chair-predicts-record-spending-in-2026/.

[8] *Party-coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4OH00192&cycle=2024 (last visited Apr. 29, 2026).

[9] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2024&is_notice=true&candidate_id=S6OH00163 (last visited Apr. 29, 2026).

[10] Liz Goodwin, *Republicans Privately Fear This Swing State Democrat*, The Wash. Post (Mar. 23, 2026), https://www.washingtonpost.com/politics/2026/03/23/ossoff-georgia-senate-midterms-democrats-republicans/?utm_campaign=wp_main&utm_source=facebook&utm_medium=social.

[11] Max Cohen & John Bresnahan, *Ossoff Gears Up for Fight of His Political Life in 2026*, Punchbowl News (Feb. 6, 2025), https://punchbowl.news/article/campaigns/jon-ossoff-gets-ready-for-2026-senate-race/.

[12] Greenwood, *supra* note 7.

[13] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4GA11285&cycle=2020 (last visited Apr. 28 , 2026).

million in independent expenditures opposing Ossoff's candidacy.[14] To that end, Senator Ossoff expects the 2026 race will draw significant spending by the NRSC, as well.

Applicant Roy Cooper is the former Governor of North Carolina. He announced his candidacy for United States Senate on July 28, 2025, and he won the Democratic Party primary election for U.S. Senate in North Carolina on March 4, 2026. Like Ohio, the NRSC has characterized the North Carolina Senate seat as a "true defensive targets."[15] Governor Cooper therefore expects the race to draw significant spending by the NRSC. In 2022, when North Carolinians last elected a U.S. Senator, the NRSC spent $1.7 million in coordinated expenditures with Senator Ted Budd for media supporting his campaign.[16] And it spent more than $6 million more in independent expenditures opposing the Democratic candidate.[17]

Applicant Kristen McDonald Rivet represents Michigan's 8th Congressional District in the House of Representatives. Representative McDonald Rivet won her seat in 2024 in an election in which Donald Trump carried her district by two points. Representative McDonald Rivet will be on the ballot in November 2026 to keep her seat in MI-8. NRCC has announced its plan to target MI-8 to expand its House majority this election cycle,[18] and Representative McDonald Rivet expects NRCC will dedicate significant resources toward advertisements opposing her reelection.

---

[14] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2020&is_notice=true&candidate_id=S8GA00180 (last visited Apr. 28, 2026).

[15] Greenwood, *supra* note 7.

[16] *Party Coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S2NC00505&cycle=2022 (last visited Apr. 28, 2026).

[17] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=NRSC&cycle=2022&is_notice=true&candidate_id=S2NC00497 (last visited Apr. 28, 2026).

[18] *NRCC Targets 26 Offensive Seats to Expand House Majority*, NRCC (Mar. 17, 2025), https://www.nrcc.org/2025/03/17/nrcc-targets-26-offensive-seats-to-expand-house-majority/.

In the 2024 election cycle, NRCC spent nearly $630,000 in independent expenditures on media opposing Representative McDonald Rivet's candidacy.[19] And in 2022, NRCC coordinated more than $100,000 in expenditures with the Republican candidate for MI-8.[20]

## ARGUMENT

### I. The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees.

The LUC Guidance must be set aside because it unlawfully requires broadcasters to offer lowest unit charge for advertisements that are not entitled to it under the Communications Act. Section 315(b)(1) provides for lowest unit charge *only* "for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign." 47 U.S.C. § 315(b)(1). Lowest unit charge is therefore available only for uses of broadcasts *by candidates*, and not for other political advertisements. The Commission has explained that "*only candidates* are entitled to lowest unit charge benefits," and it has "*never* held that independent entities" that support or oppose candidates are "entitled to the lowest unit charge." *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54, 686 (1991) (emphasis added). Commission regulations implementing the statutory lowest unit charge provision similarly provide that lowest unit charge is available for use by "any *person* who is a legally qualified *candidate* for any public office." 47 C.F.R. § 73.1942(a) (emphasis added).

As the Commission has explained, the lowest unit charge provision reflects a "Congressional effort to reduce *candidates'* escalating campaign costs." *In re Codification of*

---

[19] *Independent Expenditures*, FEC, https://www.fec.gov/data/independent-expenditures/?data_type=processed&q_spender=C00075820&is_notice=false&most_recent=true&candidate_id=H4MI08218&min_date=01%2F01%2F2023&max_date=12%2F31%2F2024 (last visited Apr. 28, 2026).

[20] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00075820&candidate_id=H0MI08141 (last visited Apr. 28, 2026).

*Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54 (emphasis added). To that end, the provision "regulat[es] rates charged political candidates," and it was "viewed [by Congress] as providing an additional break for candidates." *Hernstadt*, 677 F.2d at 897. It "was intended to ensure that, during the pre-election period, *candidates* would receive . . . volume and frequency discounts regardless of the number of announcements purchased." *Id.* at 890 (emphasis added). But its scope was intentionally limited, to avoid "imposing unreasonable and possibly economically devasting burdens on small stations." *Id.* at 898.

The LUC Guidance must be set aside as unlawful because it purports to require stations to offer lowest unit charge to advertisements from party committees engaged in coordinated spending and from JFCs, when neither constitutes the use of a broadcasting station by a legally qualified candidate, as Section 315(b)(1)'s plain text demands.

### A. Party committees' coordinated expenditures are not use by a candidate.

Party committees' coordinated expenditures are not entitled to lowest unit charge because they are expenditures by the party committees, not by candidates, so they are not "use" of a broadcasting station "by . . . a legally qualified candidate" as Section 315(b)(1) requires. This follows directly from FECA's distinction between (1) party committee *contributions* to candidate committees, which transfer funds to candidates that the candidates can then spend to purchase broadcast time for their own "use," *see* 52 U.S.C. § 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *not* the candidate, although the party and candidate are free to discuss and plan them in advance, *see id.* § 30116(d). For party committee advertisements to be *the candidate's* use, they would need to be purchased by the candidate's campaign, not by the party—and if so, they would involve *contributions* by party committees to the campaign, rather than coordinated expenditures. By treating party committee advertisements as candidate spending under the Communications Act when it is party spending

under FECA, the LUC Guidance improperly puts the two statutes "at war with one another," instead of reading them "as a harmonious whole." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

Section 315(b)(1) does not require lowest unit charge for the "use" of a broadcasting station by a political party or any other non-candidate political group—only by a "legally qualified candidate." It was specifically crafted to "reduce *candidates'* escalating campaign costs." *In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54 (emphasis added). That is why the Commission has "never held that independent entities were entitled to the lowest unit charge," even for ads supporting or opposing candidates, but has instead emphasized that "the lowest unit charge *inures to the benefit of candidates only*." *Id.* (emphasis added). If Congress had wanted to extend lowest unit charge to party expenditures also, it easily could have said so when it first authorized coordinated expenditures a short two years after passing the lowest unit charge requirement in the first place. But it opted instead to limit the entitlement to avoid "imposing unreasonable and possibly economically devasting burdens on small stations." *Hernstadt*, 677 F.2d at 898; *see also Hayes v. Sebelius*, 762 F. Supp. 2d 90, 115 (D.D.C. 2011) ("[W]hen Congress amends one provision of a statute but not another, it can be interpreted to have signaled its intention not to apply the amendment to the unaffected provision.").

Consistent with the provision's text and purpose, the Commission has historically interpreted Section 315(b)(1) to mean that "only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b)." *In re Codification of the Commission's Pol. Programming Pol'ys*, Memorandum Opinion and Order, 7 FCC Rcd. 4611, 4614, ¶ 23 (1992). As explained below with respect to JFCs, this interpretation is overbroad to the extent it permits JFCs to benefit from lowest unit charge even when some of their members are

not candidate committees. But party committees' coordinated spending fails even this overbroad test. With one exception in presidential contests that is inapplicable to Applicants' circumstances,[21] party committees are not and cannot be "authorized campaign committees" under FECA because, by their very nature, they "support[] or ha[ve] supported more than one candidate" for office, and they exist to do more than "solely . . . joint fundraising." 52 U.S.C. § 30102(e)(3)(A). Thus, party coordinated expenditures are made neither by a candidate nor by "their authorized campaign committee[]," so they fail the Commission's own longstanding test of lowest unit charge eligibility.

The LUC Guidance has no answer to these arguments. The Guidance acknowledges that advertising "purchased by political parties as an independent expenditure is not entitled to LUC." Ex. A at 2. It points out that such expenditures are not coordinated with candidates. But it does not explain how coordination could convert a party's own expenditure into the use of a station by a candidate. The more natural reading of the statute, by far, is that offered by the Solicitor General to the Supreme Court late last year: that lowest unit charge is available *only* for candidates and is "not [available] for *party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC*, No. 24-261 (U.S. Oct. 1, 2025), 2025 WL 3068193 (emphasis added). And while the Guidance purports to merely "restate previous Media Bureau guidance" on the subject, it does not cite any and Applicants are aware of none. Ex. A at 2. The only source the Guidance cites on this subject is *FEC v. Colorado Republican Federal Campaign Committee*, 41 F. Supp. 2d 1197 (D. Colo. 1999). But that case—which was ultimately reversed, *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001)—holds no such thing. The quoted language—that "independent expenditures do not qualify for the lowest rates on the purchase of

[21] FECA allows a presidential candidate nominated by a political party to designate the national committee of the party as a principal campaign committee, but only if the national committee retains separate accounts with respect to that function. 52 U.S.C. § 30102(e)(3)(A)(i).

broadcasting time, as coordinated expenditures would"—is not a holding of the court but merely a description of one party's statement of undisputed facts. 41 F. Supp. 2d at 1210.

The LUC Guidance's statement that "candidate-party coordinated advertisements are subject to the LUC provisions" is therefore unlawful, because it purports to extend the entitlement to lowest unit charge to the use of broadcasting stations by political parties, whereas—as the Commission has long recognized—Congress limited that entitlement to candidates only.

### B. Advertisements by JFCs with non-candidate members are not "use" by a candidate.

Advertisements by JFCs with non-candidate members are also not "use" of a broadcasting station "by . . . a legally qualified candidate" that is entitled to lowest unit charge because by law, much of the cost and much of the fundraising benefit of those advertisements must be borne by the non-candidate members of the JFC who have no right to lowest unit charge. In practice, those non-candidate members often completely dominate JFC fundraising. In the 2024 cycle, for example, the NRSC and Rogers for Senate formed a JFC, Michigan Victory Committee, that spent more than 98% of its receipts (more than $9 million) on advertising, while disbursing very little to its participants: just over 1% of its receipts (just under $100,000) to the NRSC, and just 0.02% (barely $2,000) to Rogers for Senate, the only candidate-committee member.[22] Under FEC rules, that means that the NRSC—the recipient of 98% of the proceeds after advertising expenses—must have paid for 98% of the more than $9 million in advertising expenses, while Rogers for Senate paid just 2%. *See* 11 C.F.R. § 102.17(c)(7). And, as explained above, the NRSC as a party committee is not entitled to lowest unit charge because its advertising expenses are not the use by *a candidate* of a broadcasting station. Yet the LUC Guidance requires stations to treat all of this

---

[22] *See Michigan Victory Committee – Disbursements*, FEC, https://www.fec.gov/data/committee/C00888883/?tab=spending#total-disbursements (last visited Apr. 28, 2026).

JFC's advertising expenses as if they are "use" by a candidate whose committee pays for almost none of them.

The Michigan Victory Committee did not stand alone. NRSC used the same strategy in Nevada and Wisconsin.[23] And even JFCs that do raise substantial money, rather than serving merely as advertising vehicles, often raise far more for party committees and PACs that are not entitled to lowest unit charge than they raise for candidate committees that are so entitled—meaning that their advertising expenses are overwhelmingly paid by committees not entitled to lowest unit charge. Grow the Majority, for example—Speaker Mike Johnson's principal joint fundraising committee—made more than half of its 2025 disbursements to party committees and non-candidate PACs, and less than half to candidate committees that could be entitled to lowest unit charge.[24]

The LUC Guidance's only justification for extending lowest unit charge to advertising purchased by JFCs like these—advertising which by law is paid for primarily by committees that are not entitled to lowest unit charge—is that the JFCs are formally designated as "authorized campaign committees" of the participating candidates. *See* Ex. A at 2. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends the candidate's share of fundraising expenses and receives the candidate's share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). But that *at most* makes the *candidate's share* of the JFC's expenditures into candidate expenditures—it does not in any way transform the portions of the

[23] *See supra* note 4.
[24] *Grow the Majority – Spending*, FEC, https://www.fec.gov/data/committee/C00858373/?tab=spending (last visited Apr. 28, 2026).

JFC's expenditures paid for by non-candidate committees into candidate use that could qualify for lowest unit charge. It therefore does not justify treating expenditures by JFCs with non-candidate members as entitled to lowest unit charge, as the LUC Guidance does, because those expenditures are partially—and often overwhelmingly—paid for by non-candidates.

The mere fact that JFCs are designated as "authorized committees" by participating candidates does not justify the LUC Guidance's anomalous treatment of JFC expenditures funded in large part by non-candidates as if they were candidate use. The phrase "authorized committee" does not appear in the text of Section 315(b)(1), which grants *only candidates* the right to lowest unit charge. Nor does it appear anywhere in the Commission's regulations. *See* 47 C.F.R. § 73.1942. The only place the phrase "authorized committee" appears in the relevant statute is in a different subsection of Section 315, 47 U.S.C. § 315(b)(2). And that Subsection (b)(2), titled "Content of broadcasts," does not grant substantive rights to candidates, authorized committees, or anybody else. Instead, it places conditions on a *candidate's* right to lowest unit charge, which is separately conferred in Subsection (b)(1). Subsection (b)(2) provides that, to be eligible for lowest unit charge, a candidate must make a "written certification" that "the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under [the Communications Act]," unless the ad also includes a disclaimer indicating that the candidate approved the broadcast and that the candidate's authorized committee paid for the broadcast. 47 U.S.C. § 315(b)(2)(A), (C). By its plain terms, this condition applies to "*any*" television or radio broadcast made by the candidate *or* the candidate's authorized committee—not just those entitled to lowest unit charge.

Subsection (b)(2) therefore does not mean that every "authorized committee" broadcast is entitled to lowest unit charge. It simply means that, for a candidate to receive lowest unit charge

for his *own* ads, he must certify that neither he nor any of his "authorized committees" will run *any* advertisement that mentions an opponent without including the required disclaimer. In other words, Section 315(b)(1) offers a limited benefit to candidates—lowest unit charge for candidate ads—in exchange for a broader commitment to abide by the conditions in Subsection (b)(2) in both candidate ads *and* authorized committee ads—including JFC ads. Nothing in the statute or its purpose limits the universe of broadcasts covered by Subsection (b)(2) to those covered by Subsection (b)(1). Thus, there is no reason to read the limitations in Subsection (b)(2) as enlarging the scope of entities entitled to lowest unit charge under Subsection (b)(1).

Confirming this, Subsection (b)(2)(B) provides that if the candidate "or any authorized committee of such candidate" breaches the conditions in Subsection (b)(2)(A), then "such *candidate* shall not be entitled to receive [lowest unit charge] on such broadcast or *any other* broadcast" within the covered period. *Id.* § 315(b)(2)(B) (emphasis added). Notably, this subsection does not say that a violation of Subsection (b)(2)(A) disentitles "authorized committees" from receiving lowest unit charge. If Congress meant for *both* "candidates" and "authorized committees" to get lowest unit charge, then the omission of "authorized committees" from this second clause of Subsection (b)(2)(B) would make little sense—it would produce a loophole that would swallow subsection (b)(2) whole. *See County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183 (2020) (rejecting a reading of a statute that "is inconsistent with the statutory text and simultaneously creates a massive loophole").

That both the "carrot" in Subsection (b)(1)—entitlement to lowest unit charge—and the "stick" in Subsection (b)(2)(B)—disentitlement from lowest unit charge—mention only "candidates" and not "authorized committees" is telling. This is particularly so because Congress *did* mention "authorized committees" in the parts of Subsection (b)(2) that describe the universe

of ads subject to the disclaimer requirement. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration omitted).

Thus, because broadcasting purchased by JFCs with non-candidate members is partially—and often overwhelmingly—paid for by non-candidate committees that are not entitled to lowest unit charge, the LUC Guidance is unlawful in requiring stations to extend lowest unit charge to such broadcasts.

### C. Applicants are aggrieved by the Media Bureau's LUC Guidance.

The Commission's regulations authorize "[a]ny person aggrieved by any action taken pursuant to delegated authority [to] file an application requesting review of that action by the Commission." 47 C.F.R. § 1.115(a). Applicants have been "aggrieved" by the LUC Guidance within the meaning of Section 1.115(a).

Federal law widely recognizes "competitive injuries" for political candidates. A candidate for office suffers a legally cognizable injury "when regulations illegally structure [the] competitive environment" governing their election. *Shays*, 414 F.3d at 87. That is, candidates "suffer injury to a statutorily protected interest if" governing regulations require them to "compete for office in contests tainted" by illegal practices. *Id.* at 85. Such an injury arises, for example, when a candidate "face[s] *intensified* competition" under an unlawful regulatory scheme, requiring them to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." *Id.* at 86.

That is just the case here. Applicants are four legally qualified candidates for the U.S. House of Representatives and U.S. Senate and their principal campaign committees. Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald

Rivet will all appear on the 2026 general election ballot. Under Section 351(b), Applicants are indisputably entitled to lowest unit charge for their political advertisements.

Applicants' races are highly competitive. NRCC has announced it is targeting Representative McDonald Rivet's seat to attempt to expand the Republicans' majority in the House of Representatives this fall.[25] And the NRSC views Senator Ossoff's seat, as well as the North Carolina and Ohio seats for which Governor Cooper and Senator Brown are running, as absolutely critical to maintain Republican control of the Senate.[26] Applicants therefore expect that the Republican party committees will dedicate substantial resources toward political advertising opposing Applicants' campaigns and supporting their opponents, including through coordinated expenditures and JFC advertising. That is exactly what NRCC and NRSC have done in recent years: these committees have spent millions of dollars in coordinated expenditures with Republican candidates in recent election cycles,[27] and it is expected this cycle will shatter existing spending records.[28]And given these projections, Applicants also expect that more JFCs will continue the practice a select few test-drove in 2024 of running advertisements that function as candidate ads for their opponents.

For the reasons Applicants explain above, a straightforward, textual reading of Section 351(b) does not require broadcasters to offer party committees or JFCs lowest unit charge in these circumstances. Broadcasters *should* be permitted to charge party committees—which are vastly better resourced than Applicants and their designated campaign committees—normal rates for airtime. But the Media Bureau's LUC Guidance instead unlawfully requires broadcasters to charge

[25] *Supra* note 18.
[26] *Supra* notes 7, 10–11.
[27] *Supra* notes 8–9; 13–14; 16–17; 19–20.
[28] *See* Cohen & Bresnahan, *supra* note 11.

party committees lowest unit charge for candidate-coordinated advertisements and JFC advertisements, thereby vastly reducing the cost to run ads against Applicants and supporting their opponents. This illegal discount for party coordinated and JFC ads places Applicants at a competitive disadvantage, forcing them to respond to a higher volume of the counter advertisements than otherwise could have been purchased at the same price point, and diluting their independent campaign messaging—which is supposed to be privileged by the Communications Act—with party messaging at lower rates than it is entitled to under law.

Moreover, because the issue directly affects Applicants' ongoing campaigns for the 2026 election, urgent action by the Commission is needed to correct the Media Bureau's erroneous guidance. Applicants reasonably expect that JFC and party-coordinated broadcast spending against them will begin in just the next few months. The Commission should therefore expedite this matter and promptly set aside the LUC Guidance.[29]

**CONCLUSION**

The Commission should set aside the LUC Guidance and explain that only candidates and their principal campaign committees are entitled to lowest unit charge.

---

[29] It was "not possible" for applicants "to participate in the earlier stages of the proceeding," 47 C.F.R. § 1.115(a), because there was no earlier proceeding—the Bureau did not solicit public input before it issued the LUC Guidance.

Dated: April 29, 2026

Respectfully submitted,

_________________________

David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

*Counsel to Applicants*

# EXHIBIT A

# PUBLIC NOTICE

Federal Communications Commission
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov
TTY: 888-835-5322

**DA 26-300**
**Released: March 30, 2026**


## FCC MEDIA BUREAU PROVIDES GUIDANCE ON ENTITLEMENT TO LOWEST UNIT CHARGE FOR LEGALLY QUALIFIED CANDIDATES FOR FEDERAL OFFICE AND ALL AUTHORIZED COMMITTEES

With another election season upon us, the FCC's Media Bureau takes this opportunity to remind broadcasters and the public about the FCC's lowest unit charge (LUC) requirements. As discussed below, the LUC requirements are applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office.

Section 73.1942 of the Commission's rules specifies that the charges made for the use of any broadcast station by a legally qualified candidate in connection with their campaign for nomination or election shall not exceed the LUC of the station for the same class and amount of time for the same period during 45 days preceding the date of a primary election and 60 days preceding the date of a general election.[1] Although section 73.1942 makes no reference to a legally qualified candidate's "authorized committee," section 315(b) of the Communications Act of 1934, as amended (Act), which section 73.1942 is intended to implement, repeatedly refers to candidates and their authorized committees as sharing the rights it confers.[2] Accordingly, the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees.[3]

To determine what qualifies as an authorized committee, the Commission relies on subsection 315(b)(2)(F) of the Act, which explicitly defines the term "authorized committee" as having the same meaning given to it by the Federal Election Campaign Act (FECA), *i.e.*, the principal campaign committee or any other political committee authorized and designated by a candidate to receive contributions or make expenditures on behalf of such candidate.[4] Additionally, although the FECA generally prohibits the designation as an authorized committee a political committee that supports more

[1] 47 CFR § 73.1942(a).

[2] *See* 47 U.S.C. § 315(b).

[3] *See In the Matter of Codification of the Commission's Political Programming Policies*, Memorandum Opinion and Order, 7 FCC Rcd 4611, 4614, para. 23 (1992).

[4] 47 U.S.C. § 315(b)(2)(F) ("authorized committee" has the meaning given such term by section 30101 of title 52"). *See* 52 U.S.C. § 30101(6) (defining the term "authorized committee" to mean "the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate"); 52 U.S.C. § 30102(e)(1) ("Each candidate for Federal office . . . shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. . . . A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate.").

than one candidate,[5] it provides an exception to allow candidates to designate as an authorized committee a political committee "established solely for the purpose of joint fundraising."[6] The FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under the FECA.

We also take this opportunity to restate previous Media Bureau guidance regarding LUC eligibility for candidate-party coordinated ads. Advertising time purchased by political parties as an independent expenditure is not entitled to LUC. These expenditures involve no coordination between the party and a candidate. By contrast, however, candidate-party coordinated advertisements are subject to the LUC provisions, provided that the ad otherwise complies with other applicable requirements in section 73.1942 of the Commission's rules and section 315(b) of the Act.[7]

Stations are always free to request documentation from parties to confirm that an entity purchasing time is eligible to receive LUC.

**-FCC-**

---

[5] 52 U.S.C. § 30102(e)(3)(A).

[6] 52 U.S.C. § 30102(e)(3)(A)(ii).

[7] *See, e.g.*, Colorado II at 1210 ("For example, independent expenditures do not qualify for the lowest rates on the purchase of broadcasting time, as coordinated expenditures would.").

# EXHIBIT B

NATIONAL ASSOCIATION OF BROADCASTERS

COUNSEL MEMO
FROM THE LEGAL DEPARTMENT

## POLITICAL ADVERTISING
## INDEPENDENT COMMITTEES AND "LUC" RATES

Many stations have encountered independent entities such as political action committees (PACs) or political parties, claiming to be "authorized" by a candidate and thus entitled to the "lowest unit charge" (LUC) for political advertising under Section 315(b) of the Communications Act of 1934 (47 U.S.C. § 315(b)). This question has also arisen in related litigation currently pending before the U.S. Supreme Court. This memo presents NAB staff's view of whether such claims, as a general matter, may be valid. This memo is not intended to provide legal advice on how the law or legal principles discussed herein may apply to a broadcast station's specific circumstances. Indeed, each station faces its own unique political and economic environment, and as such, the applicability of these views will vary based on the situation. Stations should seek the advice of their own attorneys when deciding whether an advertisement qualifies for the LUC.

NAB believes that, while a candidate's "authorized committee" is entitled to LUC, other entities are not. Specifically, under the applicable federal laws, a candidate's designated principal campaign committee is entitled to LUC rates, while "joint fundraising committees" and other "hybrid" committees are not. In fact, as detailed below, the Department of Justice, through the Solicitor General, recently reflected a similar view.

Although Section 315(b) only mentions LUC in the context of candidate ads, the FCC has historically interpreted the law to apply to both a "legally qualified candidate" and the "authorized committee of such candidate." Section 315(b)(2) states that an ad by a candidate and any "authorized committee" of the candidate that references an opponent for the same office is only entitled to the LUC if the ad includes the "stand by your ad" statement that the candidate has approved the ad. In a 1972 Public Notice, for instance, the FCC specifically denied that the LUC provision of Section 315(b)(1) applied to political broadcasts by groups, organizations, or persons other than candidates, stating: "The provision applies only to broadcasts by candidates for public office." Similarly, in a 1992 Memorandum Opinion and Order codifying its prior political programming policies, the FCC stated: "[W]e have always held that only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b). Thus, even if an independent entity produces an advertisement that includes an appearance by a candidate, that independent entity is not entitled to the LUC." Accordingly, it is not sufficient for candidate to "authorize" or approve any particular advertisement. For any

entity to claim an entitlement to LUC rates, the entity itself must be the "authorized committee" of a legally qualified candidate.

Section 315(b) defines "authorized committee" by referring to Section 30101 of the Federal Election Campaign Act (FECA) (52 U.S.C. § 30101). Section 30101 states that "[t]he term 'authorized committee' means the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate." Section 30102(e)(1), in turn, provides that each candidate shall designate a committee to serve as the "principal campaign committee of such candidate." The "principal campaign committee" is therefore an "authorized committee" within the meaning of both Section 30101 of the FECA and Section 315(b) of the Communications Act. Section 30102(e)(1) also provides that a candidate "may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate."

Section 30102(e)(3), however, generally limits the designation of additional committees as "authorized committees" to committees that exclusively support a single candidate. Paragraph (3) provides two exceptions to this limitation. First, a candidate for President nominated by a political party may designate the national committee of such political party as "a principal campaign committee."[1] Second, candidates "may designate a political committee established *solely for the purpose of joint fundraising* by such candidates as an authorized committee" (emphasis added). Thus, while such "joint fundraising committees" may be considered "authorized committees" under the FEC's rules, the plain language of the FECA limits their designation as an authorized committee *solely* to regulations regarding *fundraising*, not to any regulatory designations related to active campaigning or buying advertising. The Department of Justice, through the Solicitor General of the United States, essentially took this view in a 2025 filing with the United States Supreme Court, stating that the LUC rules "require broadcasters to charge low rates for candidate spending, ***but not for party spending—whether coordinated or independent***."[2]

NAB thus believes that, pursuant to the terms of Sections 30101 and 30102 of the FECA, only a candidate's designated principal campaign committee is entitled to LUC rates, while "joint fundraising committees" and other "hybrid" committees are not "authorized committees" eligible for LUC rates under Section 315(b) of the Communications Act.[3]

---

[1] This, of course, is applicable only to Presidential candidates and, under the terms of Section 30102(e)(3), only where the national committee maintains separate maintains separate books of account with respect to its function as a principal campaign committee.

[2] *Reply Brief for the Federal Respondents at 23, National Republican Senatorial Committee, et al., Petitioners, v. FEC, et al.*, No. 24-261, 2025 WL 3068193 (Oct. 1, 2025) (emphasis added). The Solicitor General added, "Parties could spend more money on advertisements, but broadcasters still would not be required to charge parties special low rates." *Id.*

[3] Note that, as of the date of this writing, the Supreme Court has agreed to hear arguments in a case brought by National Republican Senatorial Committee and others as to whether the First Amendment permits the government to restrict political parties from spending money on

In addition, because the key definition of "authorized committee" is tied to federal campaign finance limitations, it appears that these exceptions are limited to the narrow category of federal candidate committees. Nothing in the FECA, the Communications Act, or the FCC's rules or published cases suggests that these exceptions extend to state or local political parties, or other groups that are purportedly authorized by a state or local candidate. Thus, even if such parties claim to be "authorized" to act for a candidate under state or local law, it does not appear that they would qualify for LUC status under federal law.

*NAB's Counsel Memos are intended to serve as a source of general information on legal issues of interest to the broadcast industry. Broadcasters seeking information on how the principles discussed in a Counsel Memo apply to their specific circumstances should seek the advice of their own attorneys.*

campaign advertising with input from the party's candidate for office. (*National Republican Senatorial Committee, et. al. v. FEC, et. al*., 117 F.4th 389 (6th Cir. 2024), *cert. granted,* 2025 WL 1787717 (U.S. Jun. 30, 2025) (No. 24-261).) While some have suggested that the Court's decision in this case may broaden the scope of entities entitled to LUC rates, neither the issues to be addressed in the case nor Section 315(b) of the Communications Act appear to support such an outcome. Indeed, the Solicitor General of the United States has already explicitly denied that the Court's decision will impact LUC rates, stating "[p]arties could spend more money on advertisements, but broadcasters still would not be required to charge parties special low rates." (*Reply Brief for the Federal Respondents at 23, National Republican Senatorial Committee, et al., Petitioners, v. FEC, et al.*, No. 24-261, 2025 WL 3068193 (Oct. 1, 2025).)